UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| TYLER ALLEN CLICK, TROY BOWEN, BAILEY HENDERSON, ETHAN GALAN, LUIS G. OCHOA CABRERA, HOMERO MEDINA, MICHAEL GUIDROZ, SCOTT A. HINES, BRYAN J. TOMLIN, and QUENTIN ALEXANDER, each plaintiff is a citizen of the State of Texas, and each plaintiff individually and on behalf of all others similarly situated, | § § § § § § § § § § § | Cause No. _____  <br><br> <u>CLASS ACTION</u>  <br><br><br> **<u>JURY TRIAL DEMANDED</u>** |
| Plaintiffs, | § § § | |
| v. | § § | |
| GENERAL MOTORS LLC, a Delaware corporation, | § § § | |
| Defendant. | | |

### CLASS ACTION COMPLAINT

Tyler Allen Click, Troy Bowen, Bailey Henderson, Ethan Galan, Luis G. Ochoa Cabrera, Homero Medina, Michael Guidroz, Scott A. Hines, Bryan J. Tomlin, and Quentin Alexander, each individually and on behalf of all others similarly situated ("the Class"), file this suit against Defendant General Motors LLC ("GM"). This lawsuit is based upon the investigation of counsel, the review of scientific and automotive industry papers, and the investigation of experts with relevant education and experience. In support thereof, Plaintiffs state as follows:

### I.    INTRODUCTION

1.    General Motors LLC ("GM") has sold millions of diesel-tank automobiles equipped with high-pressure fuel injection pumps that are proverbial ticking time bombs, wholly unbeknownst to an unassuming American public who ponies-up big bucks for these vehicles' fictitious "durability," "longevity," and "topnotch fuel economy." GM promised consumers the

continued reliability of their diesel engines, but with increased fuel efficiency and power at greater fuel efficiency. However, this came with a hidden and catastrophic cost that was secretly passed on to consumers. The key was the Bosch-supplied CP4 high pressure fuel injection pump, which unbeknownst to consumers is a ticking time bomb when used in American vehicles. As GM knew all along, Bosch's CP4 pump was never compatible with American diesel fuel standards. The CP4 pump is not built to withstand the specifications for U.S. diesel fuel in terms of lubrication or water content, and it struggles to lift a volume of fuel sufficient to lubricate itself. As a result, the pump is forced to run dry and destroy itself as air bubbles allow metal to rub against metal. As a result of this defect, the pump secretly deposits metal shavings and debris throughout the fuel injection system and the engine until it suddenly and cataclysmically fails without warning, further contaminating the fuel delivery system with larger pieces of metal. The "catastrophic" (*i.e.*, complete and total) pump failure often occurs as early as "mile 0," as the fuel injection disintegration process begins at the very first fill of the tank. This total fuel injection system failure and consequential engine failure results in an outrageously expensive repair bill, even when it is "covered under warranty," all for a repair that will not truly ameliorate the issue so long as the vehicle is being filled with U.S. diesel. And, although complete and total pump failure takes time to occur, the defective CP4 pump starts damaging the vehicle's fuel injection system and engine immediately upon the vehicle's first use. Further, the sudden and unexpected shutoff of the vehicle's engine while it is in motion and then subsequent inability to restart the vehicle present an inherent risk to consumer safety—one which GM itself has acknowledged in the past. Thus, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles, which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles and throughout their lifetime. Plaintiffs and other Class members are seeking

recovery for this manifested and immediately damaging defect, in addition to any and all consequential damages stemming therefrom.

2.     What is worse, consumers are left with repair bills that range from $8,000.00 to $20,000.00 per vehicle.  Some victims of GM's grand scam are American businesses who own several vehicles and have suffered multiple failures.  Others have spent several hundred or several thousand dollars attempting to prevent or mitigate these failures.  Moreover, diesel fans pay so much more for their trucks because diesel trucks are expected to last for 500,000 to 800,000 miles, and have more power, *and* a lower fuel bill. Put simply, Plaintiffs and all members of the proposed Class paid a premium for their diesel vehicles, and were harmed by being sold vehicles with a defective fuel injection pump that is substandard for American fuel.

3.     GM saw Bosch's CP4 fuel injection pump as another way to make money—to take advantage of consumers' desire to drive diesel vehicles that were reliable, durable, fuel-efficient, and powerful.  After the CP4 fuel injection system worked marginally successfully in vehicles in Europe, GM sought to use the CP4 system in American vehicles, promising consumers exactly what they were looking for—improvements in torque, horsepower, durability, and fuel economy. But GM could never deliver on that promise for American vehicles because the CP4 fuel pump is not compatible with American diesel fuel; in fact, GM knew this from the start, and equipped its modern Duramax diesel vehicles with the European-designed CP4 fuel pump anyway.

4.     Unbeknownst to consumers, the improved fuel efficiency of the Bosch-made component CP4 pump in American vehicles comes at the cost of running the pump nearly dry so that it destroys itself, and—ultimately and catastrophically—destroys the fuel injection system and the engine altogether.  American diesel fuel is cleaner, which means that it also provides less lubrication than European diesel fuel.  The lubricity specifications of American diesel are incompatible with the specifications of the CP4 system.  When American diesel fuel is run through

the fast moving, high pressure, lower volume CP4 pump, it struggles to maintain lubrication. The cleaner, thinner diesel allows air pockets to form inside the pump during operation, causing metal to rub against metal, generating metal shavings which are dispersed throughout the fuel injection system, contaminating and destroying the fuel system and indeed the entire engine. Contrary to GM's claims that the CP4 fuel injection system is more reliable, more durable, more powerful, and more fuel-efficient, the CP4 fuel injection system is costly, destructive, and dangerous.

5.      The kicker is, GM knew from the specifications of the pump as compared to the specifications of American diesel, that the Bosch-made CP4 pump was clearly incompatible with the ordinary use of American diesel fuel. Indeed, well before GM ever chose to implement the CP4 component part (as incorporated in the diesel engines of the subject Class Vehicles), the issue of incompatibility was (or should have been) known and yet was totally ignored in the design of the Class Vehicles' engine systems. This is further evidenced by the fact that GM, as well as its fellow mega-automotive manufacturers, had experience with widespread catastrophic fuel injection pump failures when cleaner diesel standards were first implemented in the 1990s. By 2002, the Truck & Engine Manufacturers Association ("EMA")—of which GM is a member company[1]—acknowledged that the lower lubricity of American diesel could cause catastrophic failure in fuel injection system components that are made to European diesel specifications. Not only did GM fail to inform American consumers and fail to stop touting the fabricated benefits of the vehicles containing CP4 pumps, they actively attempted to shift the blame to the American consumers. For instance, GM claimed it was *consumers'* improper use of contaminated or substandard fuels that damaged the vehicles' fuel system, even when GM knew that the

---

[1]    *See* Truck & Engine Manufacturers Association (EMA) membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last visited Nov. 13, 2018).

malfunction was *actually* the result of the CP4 fuel injection pump design, which was simply not fit for American diesel fuel.

6.     Vehicle engines with the Bosch CP4 fuel injection pumps are not compatible with American diesel fuel, and GM's conduct is not compatible with American law. GM knowingly and intentionally deceived American consumers through its individual representations to respective consumers in a (successful) effort to increase revenues and profits at the expense of consumers.

7.     Indeed, Plaintiffs and similarly situated Class members have suffered from an innately manifested—though not readily apparent—defect that existed in the Class Vehicles prior to purchase (or lease), and which began damaging the Class Vehicles and their fuel delivery systems upon first use. Plaintiffs were thus injured at the point of sale and throughout their ownership of the vehicle and paid far more than they would have if GM had told the truth. Indeed, Plaintiffs and no reasonable consumer would have bought these vehicles if GM had told the truth.

8.     These consumers are entitled to be reimbursed for the millions of dollars GM fraudulently obtained from them, and to be compensated for their actual losses. This lawsuit seeks to hold GM accountable to these consumers, who are the unwitting casualties of the company's massive fraud.

## II.     PARTIES

### A.  The Plaintiffs

9.     For ease of reference, the following chart identifies the Representative Plaintiffs and their vehicles:

| Representative Plaintiff | Make | Model | Year |
|---|---|---|---|
| Tyler Allen Click | Chevrolet | Silverado 2500 HD | 2015 |
| Troy Bowen | Chevrolet | Silverado 2500 HD | 2012 |
| Bailey Henderson | Chevrolet | Silverado 2500 HD | 2013 |

| Representative Plaintiff | Make | Model | Year |
|---|---|---|---|
| Ethan Galan | GMC | Sierra 2500 HD | 2015 |
| Luis G Ochoa Cabrera | GMC | Sierra 3500 HD | 2016 |
| Homero Medina | Chevrolet | Silverado 2500 HD | 2013 |
| Michael Guidroz | Chevrolet | Silverado 2500 HD | 2014 |
| Scott A. Hines | Chevrolet | Silverado 2500 HD | 2014 |
| Bryan J. Tomlin | Chevrolet | Silverado 2500 HD | 2016 |
| Quentin Alexander | Chevrolet | Silverado 2500 HD | 2015 |

10. Plaintiff Tyler Allen Click (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Corpus Christi, Texas. In or around October 2015, Plaintiff purchased a used 2015 Chevrolet Silverado 2500 HD, VIN 1GC1KWE84FF533393 (for the purpose of this paragraph, the "Class Vehicle") for approximately $50,000.00 from AutoNation Chevrolet, an authorized GM-brand dealership in Corpus Christi, Texas. Plaintiff purchased and still owns the vehicle, and it has approximately 115,600 miles on it. Plaintiff uses his Silverado 2500 HD as his daily driver to get to and from work and for daily activities. In the days and weeks preceding Plaintiff's purchase, Plaintiff saw GM's television commercials, and heard statements from the authorized dealership's sales representatives claiming the subject Class Vehicle—i.e., the type Plaintiff would purchase—had superior horsepower, reliability, and durability compared to other trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on representations from GM and its dealership sales representatives that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for

its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, as Plaintiff would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects. In addition, Plaintiff experienced a catastrophic failure of his CP4 pump sometime around Deceember 2016. Specifically, Plaintiff was traveling by himself when his vehicle's engine cut out on a highway in Corpus Christi, Texas. The repair shop informed Plaintiff that his vehicle had metal shavings in the fuel injection pump system. The repairs cost Plaintiff approximately $10,000.00, and the vehicle had approximately 80,000 miles on it at the time. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

11. Plaintiff Troy Bowen (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Hallsville, Texas. In or around July 2013, Plaintiff purchased a used 2012 Chevrolet Silverado 2500 HD, VIN 1GC1KXC87CF191474 (for the purpose of this paragraph, the "Class Vehicle") for approximately $50,000.00 from Patterson Truck Stop, a pre-

owned truck dealership in Longview, Texas.  Plaintiff purchased and still owns the vehicle, which currently has approximately 103,000 miles on it.  Plaintiff uses his Silverado 2500 HD as his daily driver to get to and from work, for daily activities, and occasionally to haul his trailers.  In the days and weeks preceding Plaintiff's purchase, Plaintiff saw GM's internet advertisements wherein GM claimed the Duramax diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market.  On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff justifiably relied on the representation and understanding that the Class Vehicle was compatible with American diesel fuel, was durable, and was reliable.  Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it.  Such knowingly false representations, in combination with the advertised fuel economy and vehicle performance, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the defective nature of the Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing.  Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct, and would not have purchased the Class Vehicle or would have paid less for it, had GM not concealed the CP4 fuel injection system defects.  In addition, Plaintiff experienced a catastrophic failure of his CP4 pump.  Plaintiff was with his family on a mini-vacation when the vehicle suddenly stopped in the middle of the road while he was driving downhill.  The vehicle was towed to a GM dealership, where Plaintiff

was told that the fuel injection system had failed and was quoted a staggering $12,000.00 for repairs. Plaintiff then had the vehicle towed to a non-GM repair shop where he ultimately paid approximately $8,000.00 for replacement of the subject fuel pump and related system. At the time of the catastrophic failure, Plaintiff had approximately 69,000 miles on his vehicle. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

12.    Plaintiff Bailey Henderson (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Mckinney, Texas. In or around November 2016, Plaintiff leased a used 2013 Chevrolet Silverado 2500 HD, VIN 1GC1KXC84DF158059 (for the purpose of this paragraph, the "Class Vehicle") for approximately $42,000.00 from El Dorado Chevrolet, an authorized GM-branded dealership in McKinney, Texas. Plaintiff leased and still possesses the vehicle, which currently has approximately 136,000 miles on it. Plaintiff uses his Silverado 2500 HD as his daily driver to get to and from work, for daily activities, and occasionally to haul his 20-foot trailer. In the days and weeks preceding Plaintiff's purchase, Plaintiff witnessed statements from GM dealership sales representatives and through GM-brand marketing brochures wherein GM claimed its Duramax diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market. In leasing the vehicle, Plaintiff relied on the representation that the vehicle was compatible with American diesel fuel and fit for ordinary use and, absent these representations, would not have leased the vehicle or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all

of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to lease the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to leasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. In addition, Plaintiff experienced a catastrophic failure of the CP4 fuel pump in his 2013 Chevrolet Silverado 2500 HD. Plaintiff was driving home by himself when the vehicle suddenly and without warning shut off and would not restart. Upon being towed to the dealership, Plaintiff was informed that the CP4 pump exploded and sent metal shavings throughout his vehicle's fuel system. Plaintiff paid approximately $8,000.00 in repairs. At the time of this catastrophic failure, Plaintiff had approximately 88,000 miles on his vehicle. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of lease, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

13. Plaintiff Ethan Galan (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Hereford, Texas. In or around January 2018, Plaintiff

purchased a used 2015 GMC Sierra 2500 HD, VIN 1GT12ZE80FF600590 (for the purpose of this paragraph, the "Class Vehicle") for approximately $48,000.00 from McGavock Nissan, a dealership in Amarillo, Texas. Plaintiff purchased and still owns the vehicle, and it has approximately 68,700 miles on it. Plaintiff uses the Sierra as his daily driver to get to and from work, for daily activities, and occasionally to haul his 28-foot trailer. In the days and weeks preceding Plaintiff's purchase, Plaintiff witnessed GM advertisements on television and through the internet claiming that the subject Class Vehicle, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff justifiably relied on the representation and ostensible knowledge of GM that the Class Vehicle was compatible with American diesel fuel, was durable, and was reliable. Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it. Such knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and

proximate result of GM's wrongful, deceptive conduct. In addition, Plaintiff experienced a catastrophic failure of the CP4 fuel pump in his 2015 GMC Sierra. Specifically, Plaintiff was driving home one day when the service engine light unexpectedly came on, the engine began smoking, and the truck suddenly turned off and would not turn back on. Plaintiff had to have the vehicle towed for repairs to a local GM-authorized dealership, where he was told that the fuel injection pump had failed and that metal shavings dispersement had destroyed all of his vehicle's fuel injectors. Plaintiff had to pay approximately $9,000.00 for repairs. At the time of this catastrophic fuel pump failure, Plaintiff had approximately 62,000 miles on his vehicle. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

14. Plaintiff Luis G. Ochoa Cabrera (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Aransas Pass, Texas. In or around April 2016, Plaintiff purchased a new 2016 GMC Sierra 3500 HD, VIN 1GT42YE83GF168750 (for the purpose of this paragraph, the "Class Vehicle") for approximately $59,000.00 from a seller in Houston, Texas. Plaintiff still owns the vehicle and it has approximately 35,600 miles on it. Plaintiff uses his Sierra 3500 HD as his daily driver to get to and from work, and to haul his welding machine and tools. In the days and weeks preceding Plaintiff's purchase, Plaintiff heard about the truck's performance, durability, fuel economy, and power on television, and was convinced that it was the best truck for his needs. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on such representations from GM that the vehicle was compatible with American diesel fuel, was durable, and was reliable. Absent these representations, Plaintiff would

not have purchased the vehicle or would have paid less for it. These knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and unexpectedly defective nature of the Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

15.    Plaintiff Homero Medina (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Corpus Christi, Texas. On or around October 6, 2018, Plaintiff purchased a used 2013 Chevrolet Silverado 2500 HD, VIN 1GB3KZC81DF185812 (for the purpose of this paragraph, the "Class Vehicle") for approximately $29,000.00 from Allways Odem, a dealer of certified pre-owned GM vehicles in Odem, Texas. Plaintiff still owns the

vehicle, and it has approximately 59,000 miles on it. Plaintiff uses his Silverado 2500 HD as his daily driver to get to and from work, for daily activities, and occasionally to haul his 40-foot trailer. In the days and weeks preceding Plaintiff's purchase, Plaintiff saw Chevrolet television commercials and relied on Chevrolet's ostensible brand-quality based on GM's claims that the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff justifiably relied on the representation and understanding from GM that the Class Vehicle was compatible with American diesel fuel, was durable, and was reliable. Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it. Such knowingly false representations, in combination with the advertised fuel efficiency and performance, the representation that the vehicle would retain all of its promised fuel economy and performance throughout its useful life, and the Class Vehicle's reputation for maintaining a high resale value, caused Plaintiff to purchase the Class Vehicle, which is unfit for its ordinary use and purpose. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and which deceived American consumers. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the unlawfully and/or unexpectedly defective nature of the Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would

have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

16.     Plaintiff Michael Guidroz (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Orange, Texas.  On or around March 15, 2018, Plaintiff purchased a used 2014 Chevrolet Silverado 2500 HD, VIN 1GC1KYE87EF125495 (for the purpose of this paragraph, the "Class Vehicle") for approximately $42,000.00 from Ron Craft Chevrolet, an authorized GM-brand dealership in Baytown, Texas.  Plaintiff purchased and still owns the vehicle, and it has approximately 42,300 miles on it.  Plaintiff uses his Silverado 2500 HD as his daily driver to get to and from work, for daily activities, and occasionally to haul his 40-foot trailer and his camping trailer.  In the days and weeks preceding Plaintiff's purchase, Plaintiff saw GM's television commercials and heard statements from dealer sales representatives wherein GM claimed the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market.  On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on the representation and apparent knowledge of GM and its dealership sales representatives that the vehicle was compatible with American diesel fuel, had excellent fuel economy for its class, was durable, reliable, and would maintain its purportedly superior performance.  Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it.  Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and rendered the Class Vehicle unfit for its ordinary use and purpose.  Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon.  Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the

existence of the unlawfully and/or unexpectedly defective nature of the Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

17. Plaintiff Scott A. Hines (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Bryan, Texas. In or around July 2016, Plaintiff purchased a used 2014 Chevrolet Silverado 2500 HD, VIN 1GC1KXC80EF120457 (for the purpose of this paragraph, the "Class Vehicle") for approximately $40,000.00 from Caldwell Country Chevrolet, an authorized GM-brand dealership in Caldwell, Texas. Plaintiff still owns the vehicle and it has approximately 55,000 miles on it. Plaintiff uses the Class Vehicle as his daily driver to get to and from work, for daily activities, and occasionally to haul his 36-foot travel trailer. In the days and weeks preceding Plaintiff's purchase, Plaintiff saw GM's internet advertisements and television commercials wherein GM claimed that the diesel truck, like the one Plaintiff would purchase, had superior horsepower, reliability, and durability compared to other trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on the representation and ostensible knowledge of GM and its dealership sales representatives that the vehicle was compatible with American diesel fuel, had excellent fuel economy for its class, was durable, reliable, and would maintain its purportedly superior performance. Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it.

Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and rendered the Class Vehicle unfit for its ordinary use and purpose. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the defective nature of the Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing the Class Vehicle. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

18.     Plaintiff Bryan J. Tomlin (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Baytown, Texas. In or around February 2016, Plaintiff purchased a new 2016 Chevrolet Silverado 2500 HD, VIN 1GC1KVE80GF161725 (for the purpose of this paragraph, the "Class Vehicle") for approximately $65,000.00 from Classic Chevrolet, an authorized GM-brand dealership in Beaumont, Texas. Plaintiff bought the Class Vehicle because he knew that he wanted a diesel truck and he has a large fifth-wheel travel trailer that he needed to pull with a strong, reliable truck such as those that GM touted the Class Vehicles to be. Plaintiff's truck has 95,000 miles on it at this time, and he has traditionally used it to commute around town and to pull the aforementioned fifth-wheel trailer. In the days and weeks preceding his purchase of the Class Vehicle, Plaintiff specifically saw and heard promises made

by GM regarding the truck's allegedly superior horsepower, reliability, durability, and fuel economy compared to other trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on the representation and ostensible knowledge of GM and its dealership sales representatives that the vehicle was compatible with American diesel fuel, had excellent fuel economy for its class, was durable, reliable, and would maintain its purportedly superior performance. Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and rendered the Class Vehicle unfit for its ordinary use and purpose. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the defective nature of the Duramax diesel engine's CP4 high pressure fuel pump system—which is common to all Class Vehicles—prior to purchasing the Class Vehicle. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. In addition, after purchasing Plaintiff experienced a catastrophic failure of the CP4 fuel pump in his 2016 Chevrolet Silverado. Plaintiff was driving with his children in the vehicle when he suddenly felt the vehicle shudder than then fully die. The vehicle was towed to a GM dealership where Plaintiff was told that the failure was a result of "fuel contaminants," and Plaintiff paid approximately $11,000.00 for repairs. At the time of the catastrophic failure, Plaintiff's vehicle had approximately 88,000 miles on it. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase,

decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

19.     Plaintiff Quentin Alexander (for the purpose of this paragraph, "Plaintiff") is a citizen of the State of Texas, and domiciled in Little Elm, Texas. In or around December 2014, Plaintiff purchased a new 2015 Chevrolet Silverado 2500 HD, VIN 1GC1KWE84FF533393 (for the purpose of this paragraph, the "Class Vehicle") for approximately $60,000.00 from Carl Black GMC, an authorized GM-brand dealership in Kennesaw, Georgia. Plaintiff bought the Class Vehicle to use as his daily driving vehicle, and it currently has roughly 91,000 miles on it. Plaintiff purchased the vehicle with the understanding that it came with a GM-fully-backed 100,000-mile warranty, which made him believe the Class Vehicle was durable and reliable. In addition, during the days and weeks preceding his purchase of the Class Vehicle, Plaintiff saw and heard promises made by GM regarding the truck's allegedly superior horsepower, reliability, durability, and fuel economy compared to other trucks in the American market. On the date that Plaintiff purchased the vehicle, and in purchasing the vehicle, Plaintiff relied on the representations and ostensible knowledge of GM and its dealership sales representatives that the vehicle was compatible with American diesel fuel, had excellent fuel economy for its class, was durable, reliable, and would maintain its purportedly superior performance capabilities. Absent these representations, Plaintiff would not have purchased the vehicle or would have paid less for it. Unbeknownst to Plaintiff, at the time of acquisition, the Class Vehicle contained a defective CP4 fuel injection system that was not suitable for American vehicles and rendered the Class Vehicle unfit for its ordinary use and purpose. Consequently, the vehicle could not deliver the advertised combination of durability, power, reliability, and fuel efficiency of diesel that Plaintiff relied upon. Neither GM nor any of its agents, dealers, or other representatives informed Plaintiff or Class members of the existence of the defective nature of the Duramax diesel engine's CP4 high pressure fuel pump system—which

is common to all Class Vehicles—prior to purchasing the Class Vehicle. Accordingly, Plaintiff and each Class member suffered concrete economic injury as a direct and proximate result of GM's wrongful, deceptive conduct. Additionally, in July 2018, Plaintiff experienced a catastrophic failure of the CP4 fuel pump in his 2015 Chevrolet Silverado with just 70,000 miles on the vehicle. Plaintiff had just finished dinner at a Chili's restaurant in Prosper, Texas, and went to start his truck to go home; however, his truck would not start, and he had to have it towed. He wound up taking the vehicle to several different repair shops before anyone could figure out the nature of his problem, but finally one repair shop told him that they had found metal shavings in the truck's regulator filter. Plaintiff then brought the vehicle to a Chevrolet dealership in Plano, Texas, whereupon his warranty claim for repairs were rejected, as the Chevrolet dealership refused to even look at the truck. Plaintiff ultimately had to have the vehicle repaired at Wright Bros. Customs in Haslet, Texas, at a cost of approximately $11,153.20. As deemed appropriate, Plaintiff's and each other Class member's ascertainable losses include, but are not limited to, paying a high premium for the engine compared to what they would have paid for a gas-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase, decreased performance of the vehicles, and diminished value of the vehicles. Plaintiff thusly brings claims individually and as a representative of the Class.

**B. The Defendant**

20.     Defendant General Motors LLC ("GM") is a Delaware corporation with its headquarters and principal place of business located in Detroit, Michigan. Defendant General Motors LLC can be served with process through its agent The Corporation Company, 30600 Telegraph Road Ste. 2345, Bingham Farms, Michigan, 48025. The sole member and owner of General Motors LLC is General Motors Holdings LLC. General Motors Holdings LLC is a

Delaware limited liability company with its principal place of business in the State of Michigan. GM is in the business of marketing, supplying, distributing, and selling vehicles in this District.

21. Defendant GM, through its various entities, including Chevrolet and GMC, designs, manufactures, distributes, and sells GM-brand automobiles in this District and multiple other locations in the United States and worldwide. GM and/or its agents designed, manufactured, and installed the engine systems in the Class Vehicles. GM also developed and disseminated the materially misrepresentative owner's manuals and warranty booklets, advertisements, and other intentionally unreasonable and deceptive promotional materials relating to the Class Vehicles. GM also designed advertising material that it sent to GM Dealerships for the purpose of having dealers distribute these to consumers, and GM authorized dealers to communicate with consumers about the performance of the vehicles, and GM further undertook that the dealership was a place where GM could disclose material facts to prospective buyers.

### III.    VENUE AND JURISDICTION

20. Venue is proper in this District under 28 U.S.C. § 1391 in light of the following: (1) GM conducts substantial business in this District and has intentionally availed itself of the laws and markets of the United States and this District; and/or (2) Many of the acts and transactions giving rise to this action occurred in this District, including, *inter alia,* GM's promotion, marketing, distribution, and sale of vehicles containing Bosch's high injection CP4 fuel pump known in this District. Several named Plaintiffs and proposed representatives, as well as tens of thousands of Class members, purchased their Class Vehicles from the multiple GM dealerships located in this District. Further, a significant number of the Class Vehicles were registered in this District and thousands of Class Vehicles were in operation in this District. Venue is also proper under 18 U.S.C. § 1965(a) because GM is subject to personal jurisdiction in this District as alleged, *infra*, and GM has multiple agents, *i.e.*, GM-certified dealerships, located in this District.

21.     The Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interests and costs.  Subject-matter jurisdiction also arises under the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. § 2301, *et seq*.

22.     This Court has personal jurisdiction over Defendant GM pursuant to 18 U.S.C. §§ 1965(b) and (d), and Tex. Civ. Prac. & Rem. Code § 17.042, and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  GM has committed and continues to commit acts giving rise to this action within Texas and within this judicial District.  GM has established minimum contacts within the forum such that the exercise of jurisdiction over GM would certainly not offend traditional notions of fair play and substantial justice. In conducting business, *i.e.*, marketing, supplying, and distributing GM-brand automobiles within the State of Texas, and specifically, within this judicial District, GM derives substantial revenue from its activities and its products being sold, used, imported, and/or offered for sale in Texas and this judicial District. GM has multiple GM-brand dealerships in the state of Texas and sells thousands of automobiles each year in the state. GM provides advertising and customer facing information to these dealers for the purpose of exposing consumers in Texas to that information.

## IV.     FACTUAL ALLEGATIONS

### A.  The Class Vehicles

23.     For purposes of this Complaint, the "Class Vehicles" consist of the following GM-manufactured diesel-fueled U.S. automobiles:

- 2011–2016 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2010–2011 Chevrolet Express van with Duramax LGH engines;

- 2010–2011 GMC Savana van with Duramax LGH engines;

- 2010–2011 GMC Sierra trucks with RPO ZW9 (chassis cabs or trucks with pickup box delete) with Duramax LGH engines;

- 2011–2012 Chevrolet 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011–2012 Chevrolet 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011–2012 Chevrolet 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines; and

- 2011–2012 Chevrolet 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines.

**B. The Rise of Diesel Vehicles in the United States**

24.     Diesel engines have long enjoyed a loyal following in some U.S. market segments because of their reliability, fuel efficiency, and power.  Diesel engines produce higher torque, even at low revolutions per minute ("RPM"), making them popular in buses, heavy-duty pickups, and vans, including commercial vehicles, farm trucks, and ambulances.

25.     With the invention of common-rail systems, diesel fuel was injected at higher pressure, forming a finer mist that increases fuel efficiency and power.  Common-rail systems also made diesel engines burn cleaner and with less noise.  While diesel had long been popular overseas, these advances fueled a growing market here in the U.S. for diesel trucks, and even diesel passenger cars.

26.     From the outset, GM was in competition with fellow "Big Three" auto manufacturers like Ford and Fiat Chrysler, each racing to dominate the growing American diesel vehicle market.  GM looked to Europe and the expertise of international automotive parts supplier Bosch to increase the fuel efficiency and power of its diesel engines.  The heart of this diesel revolution would be powered by Bosch's extremely durable CP3 fuel injection pump, the predecessor to the CP4 fuel injection pump at issue in this suit.  The CP3 pump was one of Bosch's heavy-duty injection pumps, simplified for increased reliability.  The reliability of the CP3 became key to the "million-mile" performance of diesel truck engines in the U.S.  Not surprisingly, American trust in diesel technology grew.

27.     Americans paid a premium for the increased reliability, fuel efficiency, and power of diesel—and, Bosch promised to continue to deliver advances and continued improvements in diesel engine technology.  Bosch claimed that the next generation of fuel pump, the CP4, would maintain reliability while also increasing fuel efficiency and power. According to Bosch, the CP4 provides "[demand-based delivery from tank to rail[.]"[2]  In addition, the component manufacturer explains its high-pressure pump, and its function(s), as follows:[3]

> The high-pressure pump CP4 delivers the fuel into the connected rail under high pressure. The CP4 consists of one or two high-pressure elements, each integrated in a housing with its own camshaft. The pump camshaft is driven by belts, chains, or cogwheels and moves the pump pistons to generate the required high pressure.
>
> The fuel is delivered from the tank to the pump via a low-pressure connection. The fuel lines lead from the high-pressure connectors on both high-pressure elements to the rail. The metering unit is connected electrically to the control unit and is responsible for the requirement-driven supply of the pump with fuel. Fuel which is no longer needed flows back into the tank via a further low-pressure connection.

---

[2] *See* Bosch's "Products and services" page, available at https://www.bosch-mobility-solutions.com/en/products-and-services/passenger-cars-and-light-commercial-vehicles/powertrain-systems/common-rail-system-piezo/high-pressure-pump-cp4/ (last accessed Dec. 2, 2018).

[3] *See id.*

The CP4 common-rail pump has proven highly successful on the market. Over 40 million units have been produced globally so far. It has a modular construction, and as Bosch advertises, can be adapted to the customer's needs.

The CP4 handles pressure levels from 1,800 to 2,700 bar and is used for both on- and off-highway applications from passenger cars, light[-] and medium[-]duty vehicles, up to small heavy[-]duty vehicles. [As Bosch purports,] "[t]he variants tailor-made for each segment differentiate themselves with regard to, for example, lifetime, robustness, and maximum flow rate."

The fuel-lubricated CP4 consists of one or two high-pressure elements, each integrated in a housing with its own camshaft. The pump camshaft is driven by belts, chains, or cogwheels and moves the pump pistons to generate the required high pressure. The fuel is delivered as required using an integrated cogwheel pump or electric fuel pump.

The engine control unit enables the delivery of the required quantity of fuel. It communicates with the metering unit or the optional electric suction valve (eSV) on the pump. Use of the eSV improves the filling of the high-pressure pump compared to the variant with the metering unit, especially in the higher speed ranges.

In essence, Bosch's own predominance in the global market carries with it the superficial guarantees of quality and trustworthiness. This may have helped OEMs like GM to get the "jump" on market competitors—*but at what cost? And payable by whom?*

28.     Much like what occurred in the nationwide Volkswagen emissions scandal involving Bosch, reliance on Bosch's expertise in the design of diesel engines would lead GM into a course of action it should now regret. The heart of GM's success under increasingly competitive fuel efficiencies was Bosch's cheaper, substandard CP4 fuel injection pump. Bosch had the technical know-how to do what needed to be done to get ahead; unfortunately for the American public, the easiest way for GM to succeed was to cheat American consumers on durability and overall vehicle functionality by equipping the Class Vehicles with this ticking time bomb of a fuel injection pump that doomed the modern GM Duramax diesel engine system from day one.

**C. The History of the CP4 Defect**

29.     The Bosch CP4 pump operates at higher pressures than its predecessor, the CP3. The CP4 achieves greater fuel efficiency by pumping less fuel through the engine. The Bosch CP4 Pump had a proven track record in Europe, but it is not compatible with American diesel fuel.

30.     The CP4 relies on the diesel fuel itself to maintain lubrication. The lubricity of diesel in Europe is more standardized than American diesel, but European diesel is also dirtier. Because the sulfur in diesel exhaust is a major cause of smog and acid rain, in 2007, the EPA required diesel fuel sold in the U.S. to have less than 15 ppm of sulfur. This is known as Ultra Low Sulfur Diesel ("ULSD"). It is produced through a refinery process known as hydrodesulfurization ("HDS"). Sulfur provides some of the lubricity needed for the pump to operate. But more importantly, the refinery process required to produce low sulfur diesel destroys a variety of important nitrogen and oxygen based polar and organic compounds that give diesel fuel its lubricity. Indeed, ULSD fuel is considered to be very 'dry' and incapable of lubricating vital diesel fuel delivery components, specifically high-pressure fuel pumps and injectors; as a result, American diesel does not contain the lubrication necessary for the Bosch CP4 Pump to operate durably, and these fuel injection system components "are at risk of premature and even catastrophic failure when ULSD fuel is introduced to the system."[4] As a result, American diesel does not contain the lubrication necessary for the Bosch CP4 Pump to operate durably.

31.     Low sulfur diesel fuel first appeared in American markets in the 1990's, with fewer than 500 ppm of sulfur. It is estimated that 65 million fuel injection pumps failed as a result. It was thought that the pumps failed at the equivalent of 100 to 200 hours of operation. Thus, the critical importance of lubricity for diesel injection pumps was well known to all auto

---

[4] Spicer, Arlen, Aug. 26, 2007 Industry Publication, "Diesel Fuel Lubricity Additives: Study Results," The Diesel Place.

manufacturers for a decade or more before the Class Vehicles were designed or introduced into the market.

32.     Engine manufacturers were well aware of the mismatch between engine part specifications that require a maximum of 460 wear scar, and the lower lubricity specifications of Ultra Low Sulphur American diesel fuel:

> Lubricity describes the ability of a fluid to minimize friction between, and damage to, surfaces relative to motion under loaded conditions. Diesel fuel injection equipment relies on the lubricating properties of fuel. Shortened life of engine components such as fuel injection pumps and unit injectors can usually be attributed to lack of fuel lubricity and, hence, lubricity is of concern to engine manufacturers. This property is not addressed adequately by ASTM D 975.

4/22/2002 Engine Manufacturers' Association, Position Statement titled, "EMA Consensus Position Pump Grade Specification." GM is a member of the Engine Manufacturers' Association.[5]

33.     Further, the Engine Manufacturers' Association made clear:

> Regardless of the fuel sulfur level, ASTM D975 currently requires lubricity specified as a maximum wear scar diameter of 520 micrometers using the HFRR test method (ASTM D6079) at a temperature of 60°C. Based on testing conducted on ULSD fuels, however, fuel injection equipment manufacturers have required that ULSD fuels have a maximum wear scar diameter of 460 micrometers. EMA recommends that the lubricity specification be consistent with the fuel injection equipment manufacturers' recommendation.

8/8/2005 Engine Manufacturers Association, Position Paper titled "North American Ultra Low Sulfur Diesel Fuel Properties."

34.     In 2005, the EPA instituted a lubricity requirement for the lower sulfur diesel sold in the U.S. It required sellers of diesel to ensure the fuel meets a minimum lubricity level of a maximum wear scar diameter of 520 microns based on the testing and standard propounded by the American Society for Testing and Materials ("ASTM") D-975.

---

[5] *See* Truck & Engine Manufacturers Association (EMA) membership webpage, http://www.truckandenginemanufacturers.org/companies/ (last accessed Nov. 13, 2018).

35.     By 2007, on-road diesel fuel in the U.S. for highway vehicles was uniformly ULSD, which has an allowable sulfur content much lower (15 ppm) than the previous U.S. on-highway standard for low sulfur diesel (500 ppm)."[6]

36.     In reality, U.S. diesel frequently contains even less than 15 ppm, a truth that is widely known within the U.S. automotive industry.  For example, according to a 2014 Infineum Worldwide Winter Diesel Fuel Quality Survey in which 341 diesel fuel samples were tested from around the world, **all** diesel fuel samples that the organization collected and tested from the U.S. and Canada contained 10 ppm S or less:[7]

37.     Moreover, back in September 2009, the Joint Diesel Fuel Injection Equipment Manufacturers ("Joint FIE Manufacturers") released a "Common Position Statement regarding Fuel Requirements for Diesel Fuel Injection Systems," in which the Joint FIE Manufacturers expressed the following key points to their U.S. automotive industry customers:

> "The continuous world-wide tendency to increase engine performance and reduce emissions has necessitated the development of new generations of enhanced diesel fuel injection equipment, supporting the achievement of stringent legislation targets.  Rising injection pressures and multiple injections result in higher operating temperatures, increased contract pressures and reduced clearances . . . .  Alterations to fuel quality, e.g., by increasingly severe refinery hydroprocessing being introduced to remove Sulphur also reduce the content of aromatics and destroy surface active compounds and antioxidants. ***Removal of these beneficial compounds effects boundary lubrication, commonly known as lubricity, and inherent oxidation stability and must be compensated for.*** Fuel parameters such as

---

[6] *See New Ultra Low Sulfur Diesel fuel and new engines and vehicles with advanced emissions control systems offer significant air quality improvement*, Clean Diesel Fuel Alliance, Feb. 25, 2017,                                                   available                                              at https://web.archive.org/web/20170225141751/http://www.ct.gov/deep/lib/deep/air/ultra_low_sul fur_diesel/ulsdfs.pdf (last accessed Nov. 30, 2018); *see also* J. Thijssen, LLC, *The Impact of Future Diesel Fuel Specifications and Engine Emissions Standards on SOFC*, U.S. DEPT. OF ENERGY, NAT'L ENERGY TECHNOLOGY LABORATORY, Jun. 29, 2004, at I, available at https://www.netl.doe.gov/File%20Library/research/coal/energy%20systems/fuel%20cells/DOE-Diesel-Final-040629.pdf (last accessed Nov. 29, 2018).
[7] *Infineum Worldwide Winter Diesel Fuel Quality Survey 2014*, INFINEUM INT'L LTD., available at https://www.infineum.com/media/80722/wdfs-2014-full-screen.pdf (last accessed Dec. 3, 2018), at 6-7.

cetane number, viscosity, density, lubricity, oxidation stability, sulfur and aroma content, together with the absence of free water and dirt contamination, are key parameters required to ensure performance of equipment in the field.

"Biofuels are becoming increasingly available to end-users [including] in the United States of America . . . . It must be recognized that the physical and chemical characteristics of bio components are significantly different to conventional fuels and that care must be taken in their specification and use.

"Diesel fuel injection equipment (FIE) manufacturers fully support the development of alternative sources of fuel . . . . ***However, many vehicles, engines and equipment are not designed to run on them. It is recommended to refer to the vehicle and engine manufacturers 'Limitations of Use' documents for guidance.***"[8]

38.     A prudent manufacturer would design or select a fuel injection pump designed for the fuel of the country in which the vehicle is to be sold.

39.     Yet GM solicited Bosch to provide the CP4 Pump for GM's Duramax engines in the 2010 and 2011 model years. It was no secret to GM that the Bosch CP4 Pump was inappropriate for diesel vehicles in the U.S. The Bosch CP4 Pump specifications for fuel lubricity allow for a maximum of 460 wear scar. By definition, the 520 wear scar specification of American diesel fuel is inadequate to lubricate the Bosch CP4 Pump.

40.     In order to reduce costs and increase fuel efficiency, GM sold vehicles with a fuel injection pump that was clearly out of specification, having inadequate lubrication for the U.S. market.

41.     Moreover, the adverse effects of ULSD on high-pressure fuel pump injection systems have been acknowledged within the automotive industry. For example, in a July 2014

---

[8] Joint FIE Manufacturers, *Fuel Requirements for Diesel Fuel Injection Systems: Diesel Fuel Injection Equipment Manufacturers: Common Position Statement 2009*, Sept. 2009, available at http://www.globaldenso.com/en/topics/files/common_position_paper.pdf (last visited Nov. 29, 2018) (emphasis added).

study on the use of fuel injection equipment with global diesel fuels, Parker Racor, the leading global supplier of diesel fuel filtration systems, explained the following:

> "The increase in system pressures in diesel engines has a significant effect on filtration requirements. These systems are highly vulnerable to many forms of contaminants and the need for robust high efficiency filtration has never been higher . . . . An analysis of global diesel fuel quality shows that although the fuel quality in the developed markets has improved, significant quality concerns still remain. Levels of water and contaminants remain at levels that can cause long term issues to the latest fuel injection systems. Specifically, the levels of contaminants smaller than 5 microns remain very high. These particles can be small enough to pass into the internal clearances of high pressure fuel injection systems and can lead to erosion and wear of critical areas leading to a loss in system performance and eventually system malfunction. Diesel filtration balances pressure drop, useful life and efficiency. ***However the real long term effect on fuel system life is often not adequately considered[,] as much of the engine durability testing performed is done using high quality fuel that doesn't represent the range of fuels seen in the market***. Consideration of filtration performance under less than ideal conditions is necessary to develop an acceptable level of protection."

Steven Hardison & Adam Pearce, *July 2014 Summary of Fuel Injection Equipment with Respect to Diesel Fuel Filtration*, PARKER RACOR & AVL, Jan. 7, 2015, available at https://www.parker.com/literature/Racor/RSL0194%20Rev%20-%20(TAP_AVL-Fuel-Study-Racor).pdf (last accessed Dec. 3, 2018), at i; *see also id.* at 13 ("Careful monitoring of fuel quality and filter performance is needed to protect sensitive diesel engine injection systems"); *id.* at 29 ("To avoid costly engine and fuel system components damages, advanced multi-stage filtration is recommended"); *id.* at 31 ("Modern high pressure diesel fuel injection systems contain very small internal clearances and are vulnerable to any build-up of deposits on these components . . . . This issue has become a significant concern in the industry").

42.     Indeed, the U.S. automotive industry was aware of the incompatibility issues early on. For example, in May 2010, after analyzing foreign particles found in the fuel filter of a failed Audi diesel engine and determining that the biodiesel used in the subject engine was "insufficient[ly] cleans[ed]" resulting in deposit formation "which is not conducive to establishing

the lubricating film in the [fuel pump] roller support," Bosch noted that, "When [diesel fuel] viscosity is too low, the lubricating film is not established properly and mixed friction and surface contact occurs = bad."[9]

43.    The Bosch CP4 Pump multiplies the diesel fuel problem in ways that are catastrophic.  But GM chose the Bosch CP4 Pump because it was supposed to improve fuel efficiency by using less fuel.  The Bosch CP4 Pump struggles to supply adequate fuel to the engine under the lower pressure of newer engines.  The combination of the low volume of fuel, which is under constant suction, and the low lubricity of the fuel, allows cavitation of the fuel.  Air pockets form inside the pump during operation.  These air bubbles allow metal to rub against metal.  GM had achieved greater fuel efficiency at the expense of running the pump dry.

44.    As the Bosch CP4 Pump wears, it sends metal shavings and sometimes even larger particles throughout the fuel system. As the shavings disperse and contaminate the engine and the high-pressure fuel system, the fuse of the proverbial CP4 "time bomb" has been lit, and it is only a matter of time before the entire engine system fails. The failure of a CP4 pump requires repair or replacement of the entire high-pressure fuel system, including the pump, fuel injectors, fuel rails, and injection lines.[10]  Repair costs when a CP4 pump fails average between $8,000.00 and $20,000.00.

45.    As Diesel Tech Magazine, an industry publication, aptly explained in its December 2017 article entitled, "Common Problems: The CP4 Time Bomb[:]"

---

[9] Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 12–14 (May 26, 2010 email chain between Audi and Bosch representatives re: "Particle analyses, fuel filter").

[10] *See*, *e.g.*, Nov. 18, 2016, "2011-2015 6.6L LML/LGH Duramax Diagnostics," <u>Oregon Fuel Injection, Inc.</u>, at 6, available at https://cdn.oregonfuelinjection.com/content/uploads/2016/08/gm-duramax-11-15-diagnostic.pdf (last accessed Nov. 17, 2018) (providing diagnostic tips for addressing CP4 failures and noting, "**Note: The CP4.2 pumps are not as durable as the CP3 pumps . . . . When they fail it is often catastrophic and they send metal particles throughout the high pressure side of the fuel system, causing further damage**").

"It's always frustrating to finally get your hands on a brand-new truck (or at least, new to you) and find out there's something wrong with it. It's even more frustrating to learn that not only are you not alone in your suffering, but that it's a common problem to your vehicle. . . . To kick things off, we're going to look at something that's very near and dear to our hearts: the CP4 injection pump. . . . Boy, where to begin? People have taken a somewhat hyperbolic approach and refer to the CP4 as a time bomb, among other colorful terms. The thing is, they're not too far from the truth. Even if you have a 100 percent stock pickup, there's a *really* good chance that you're going to be on the receiving end of a $10,000 bill when it finally goes out on you and destroys your entire fuel system."[11]

46.     The Bosch CP4 fuel injection pump was defective and incompatible with U.S. diesel fuel from the get-go, even prior to its usage in the Class Vehicles. CP4-based failures began running rampant in American Audi and Volkswagen vehicles at least as early as 2008.[12] Indeed, in February 2008, Bosch began meeting with Audi and Volkswagen representatives on a monthly—or sometimes *weekly*—basis to track CP4 pump field failures that the auto manufacturers were seeing in the U.S.[13] These failures echo the very failures that continue to occur in the Class Vehicles to this day, and from late 2011 through early 2012, documentation regarding these widespread CP4 failures was publicly provided by Bosch, Audi, and Volkswagen to the National Highway Traffic Safety Administration ("NHTSA") in connection with NHTSA's

---

[11] Trevor Mason, *Common Problems: The CP4 Time Bomb*, DIESEL TECH, Dec. 2017, available at https://www.dieseltechmag.com/2017/12/common-problems-the-cp4-time (last accessed Nov. 28, 2018) (internal punctuation omitted).

[12] *See*, *e.g.*, Jul. 7, 2008 email between Audi and Bosch representatives re: "Performance drop AU716 98017 with shavings in the HPP," discussing how "[s]omething is disintegrating" in the Audi 716 fuel pump and that "[w]e are a bit speechless" about "[t]he shavings, or whatever it is"), submitted as part of Bosch's May 2012 responses to NHTSA ODI Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 6; *id.* at 27 (Jul. 31, 2008 email from Audi representative re: "Fuel quality in [**REDACTED**]," stating that, "With our [Audi's] V6TDI with the high-pressure pump CP4.2 we have significantly higher failure rates in [**REDACTED**] (higher by a factor of approx. 30 than the average of all markets) . . . .  Have you any information suggesting that such a thing could be possible with this country-specific diesel fuel?").

[13] *See, e.g.*, *id.* at 28–31 (Feb.-May 2011 email chain between Audi, Volkswagen and Bosch representatives re: "Status CP4 USA," in which the parties discuss the substantial increase in warranty claims with the implementation of the CP4 in vehicles in the U.S. market).

Office of Defect Investigations ("ODI") Inquiry No. INRD-EA11003, an investigation which GM was subject to as well.[14]

47.    This documentation demonstrates the nature of the CP4 defect that would ultimately come to exist in the Class Vehicles. For example, in August 2009, Audi sent Bosch a failed CP4 fuel pump for analysis after "[t]he high pressure fuel pump failed catastrophically shedding metal shavings throughout the entire fuel system . . . . This car will require a complete new fuel system from tank to injectors and everything in between. This will be a very lengthy repair (weeks) . . . . We need to determine if component failure or bad fuel is to blame." March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 35. Thereafter, on September 1, 2009, Bosch responded to Audi with the following flippant analysis note from their failed pump inspection: "Gentleman, [t]he pump mentioned below was analyzed. The result of the finding is sand-like particles in the fuel. *Defect caused by customer*." *Id.* at 38 (emphasis added).[15]

---

[14] *See*, *e.g.*, *infra* ¶¶ 56–57 and corresponding footnotes (discussing GM's responses to NHTSA's requests pursuant to ODI Inquiry No. INRD-EA11003).

[15] *See also* March 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 21 (Mar. 31, 2008 email from Volkswagen to Bosch re: "Radio: Drivetrain damage failure US07 (Jetta)," in which the parties are discussing an HPFP failure in a 2007 Jetta and an exasperated Volkswagen representative states, "Can you (panel of experts) explain to us how the failure mechanism was after this mileage? . . . . We will certainly not accept a failure because of fuel quality! . . . We also see a big risk here for our BIN5 pump, which has to manage with the same fuel in USA"); May 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59334P.pdf," at 9–10 (Jul. 4, 2008 email from Audi to Bosch re: "CP4 BIN5 3rd and 4th failure in USA," analyzing root cause of CP4 field failures and positing, "Why is it that EC pumps do not fail? Because of a different fuel?"); *id.* at 13–14 (Jul. 11, 2008 email between Audi and Bosch representatives re: "W19 BIN5 pump failure" in which Audi writes, "For the zero error meeting in FeP on Tuesday we expect the information discussed at the error meeting on endurance testing of fuels with 'poor lubricity, containing water etc.' and all failures, drivetrain damage in all component, system and other endurance runs of Bosch and all customers"); Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 7 (emphasis added) (Jun. 30, 2009 email between Bosch and Audi representatives re: "ANS: HPP measures/ USE," in which the Audi representative writes, "I don't think you're reading my mails anymore! Please look at the failure curves specifically, then you'll

48.     Thus, even earlyf on, it was well known in the U.S. automotive industry that there were serious U.S. diesel incompatibility issues that now run rampant in the Class Vehicles due to the defective CP4 pump.

49.     Likewise, in September 2009, Bosch, at the time supplying the defective CP4 fuel pump to Audi and Volkswagen, received a notice from Audi about a "3rd HPP failure" in the U.S., explaining, "I'm afraid there's bad news from the U.S.: After 2 failures in the field . . . the 3rd HPP failure has now occurred in the EC endurance run."[16] Photos attached to the email show the failed Bosch CP4 fuel pump, replete with metal shavings in the gasket:[17]



---

see that **we only have a problem in certain markets[.] . . . Depending on how poor the fuel currently on the market is**"); *id.* ("I'd prefer to have a more robust pump").

[16] Sept. 2, 2009, email from Audi representative to Bosch representatives regarding "3rd HPP Failure USA," produced in response to NHTSA Inquiry EA11003EN-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Nov. 6, 2018), at 146.

[17] *Id.* at 148–50.







50.     By March 2011, Bosch was continuing to receive "a respectable number of claimed [failures in] CR-pumps Typ CP4 for US-07" about which Volkswagen dealerships were reporting, "'[m]etal particle[s] at the filter.' In a few cases the [dealer] use[s] this as an indication, to verify a mechanical breakdown from the CR-pump." Bosch's response? "Please note[:] To find some particle [sic] or dust in the main filter box, can not be prevented."[18]

51.     In June 2011, Bosch received a report from Volkswagen regarding a CP4 pump failure in a 2.0L Volkswagen TDI in which the Volkswagen representative explained, "I have here a pump from [sic] a 2.0L TDI. I have been testing a lot of these this week and many have an amount of 'metal Debris' or other metallic particles in them."[19] The following image of the contaminated pump accompanied the email:

---

[18] Mar. 22, 2011, email from Bosch employee to Volkswagen employees regarding analysis of failing CP4 fuel pumps, produced in response to NHTSA Inquiry EA11003EN-00639[0], available at https://static.nhtsa.gov/odi/inv/2011/INRD-EA11003-59428P.PDF (last accessed Nov. 6, 2018), at 11; *see also id.* at 19–22 (showing results of Bosch's pre-analysis of HPFP failures in Volkswagen/Audi vehicles where "metal chips found in fuel system").

[19] Mar. 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 12 (Jun. 9, 2011 email from Volkswagen Group of America, Inc. to Bosch re: "2.0L TDI Fuel Pump").



52.    Indeed, Bosch CP4 failures in U.S. Audi and Volkswagen vehicles were widespread and catastrophic by the end of 2011. *See* Jul. 27, 2012 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59345P.pdf," at 69 (emphasis added) (Sept. 15, 2011 email from Volkswagen to Bosch re: "080211_Status_CP4.1_Bosch," in which the Volkswagen representative sends a formal "change request in [the] form of exemplary documents on failures of high-pressure diesel pump Bosch CP4.1. ***I think the failures are well known***. It is also important to know that not only the high-pressure fuel pump, but the entire injection system is to be replaced in case of damage to a HPP with a cost >[**REDACTED**] caused by chip contamination").

53.    Yet, GM went on to contract with Bosch to supply the CP4 fuel pumps in 2011 and later model years. Seeking to gain an advantage, GM began a long partnership with Bosch in 2000. But from the beginning, GM was aware of a mismatch between Bosch's European fuel injection pumps and American diesel fuel.

54.    GM set out to design a modern diesel engine for its pickup trucks.  In 2000, GM formed a joint venture with Isuzu, called "DMAX" to create the 6.6L Duramax V8 engine.  DMAX then teamed up with Robert Bosch GmbH to incorporate Bosch's high pressure common-rail for fuel injection.  Two years later, the Duramax engine had garnered 30% of the U.S. market for

diesel pickup trucks. The Duramax engine has long been an option on GM pickups, vans, and medium-duty trucks, and has undergone many changes over the years.

55. For 2010, GM created the LGH version of the Duramax engine. It featured increased power, increased torque, and greater fuel efficiency. But, in order to achieve greater fuel efficiency, the Duramax LGH engine incorporated a newer, lower-volume fuel injection pump, Bosch's CP4 pump.

56. On February 7, 2011, as the first models of the Class Vehicles were being sold, NHTSA's Office of Defect Investigations ("ODI") opened an investigation certain major automotive manufacturers for a potential defect in predecessor diesel high pressure fuel injection pumps as well as certain model year vehicles containing the CP4 pump.[20] As part of that investigation, in October 2011, ODI requested "peer vehicle" information from GM, specifically regarding (among other things) an "[a]lleged defect" involving "[a]ny one or more of the following symptoms or conditions[:] (1) HPFP failure; (2) *Metallic debris/contamination in the fuel system*; (3) Repairs involving fuel system replacement; (4) General allegations of fuel pump failure (*i.e.*, the specific fuel pump is not identified); or (5) All other allegations of fuel system failures or malfunctions resulting in engine stall."[21]

57. Among other things, GM responded that in the 2nd quarter of 2011 *alone*, it was aware of at least *ninety-nine* (99) field reports of high-pressure fuel pump failure in the 2011 Chevrolet Silverado HD, thirty (30) of which involved moving stalls.[22]

---

[20] *See* Feb. 7, 2011, NHTSA ODI Resume for Investigation No. EA 11-003 regarding "High-Pressure Fuel Pump Failure (HPFP)," available at https://static.nhtsa.gov/odi/inv/2011/INOA-EA11003-5971.PDF (last accessed Nov. 16, 2018).

[21] Oct. 7, 2011, Ltr. from Frank S. Borris, Director, Office of Defects Investigation, to Carmen Benavides, GM Director of Product Investigations, available at https://static.nhtsa.gov/odi/inv/2011/INPR-EA11003-48548.pdf (last accessed Nov. 16, 2018).

[22] Dec. 3, 2011, Ltr. from Carmen Benavides, head of GM Product Investigations and Safety Regulations, to Frank Borris, head of NHTSA's Office of Defects Investigations (ODI), in

58.     GM was touting the improved durability of its all-new Duramax LML engine, which was installed in many of the subject Class Vehicles and incorporated the CP4 fuel pump. Indeed, GM claimed that the Duramax LML improve durability while increasing fuel injection pressure to 29,000 psi, increasing noise reduction and also tolerating up to 20% biodiesel fuel mixtures, and added a urea-based diesel exhaust fluid ("DEF") system to treat its exhaust. The Duramax LML continued to use the new lower-volume Bosch CP4 fuel injection pump, as did some of the Duramax LGH's, including but not necessarily limited to the following vehicles:

- 2011–2016 Chevrolet 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 Chevrolet 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 Chevrolet 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 GMC 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2010–2011 Chevrolet Express van with Duramax LGH engines;

- 2010–2011 GMC Savana Van with Duramax LGH engines;

- 2010–2011 GMC Sierra Trucks with RPO ZW9 (chassis cabs or trucks with pickup box delete) with Duramax LGH engines;

- 2011–2012 Chevrolet 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011–2012 Chevrolet 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011–2012 Chevrolet 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines;

response    to    ODI    Inquiry    No.    EA11-003,    at    3,    available    at https://static.nhtsa.gov/odi/inv/2011/INRL-EA11003-50067P.pdf (last accessed Nov. 16, 2018).

- 2011–2012 Chevrolet 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines.

59. Some of these vehicles are modified for commercial purposes, such as cargo vans, specialized work trucks, and a variety of ambulances offered by GM. The CP4 has long experienced problems, and the failure of these pumps can be devastating to people and businesses alike. The CP4 performed terribly from the start, but GM put it into more and more engines.

60. Moreover, GM was on notice—and indeed, has repeatedly *admitted*—that the safety risks of moving stalls or "no-starts" such as those associated with the CP4 fuel pump pose an inherent risk to vehicle occupant safety. In 2014, GM issued a series of safety recalls for approximately 30 million vehicles due to an ignition switch defect which caused, among other things, loss of engine power (in other words, moving stalls), which "increase[e] the risk of a crash."[23] Because the Class Vehicles have an inherent safety defect (as evidenced by the customer complaints cited herein), the purchasers and lessors of the Class Vehicles have been economically injured, because a vehicle which later turns out to have a safety defect is clearly worth less than it was at the point-of-sale while the defect was still being concealed.

61. The federal Safety Act and related regulations require the quarterly submission to NHTSA of "early warning reporting" data, including claims relating to property damage received by the automotive manufacturer, warranty claims paid by the automotive manufacturer, consumer complaints, incidents involving injury or death, and field reports prepared by the automotive

---

[23] *See*, *e.g.*, GM 573 Ltr. to NHTSA re: NHTSA Recall No. 14V346, Jun. 19, 2014. The full relevant text of paragraph 573.6(c)(5) reads as follows:

"There is a risk, under certain conditions, that some drivers may bump the ignition key with their knee and unintentionally move the key away from the "run" position. If this occurs, engine power, and power braking will be affected and power steering may be affected, increasing the risk of a crash . . . ."

manufacturer's employees or representatives concerning failure, malfunction, lack of durability, or other performance issues. 49 U.S.C. § 30166(m)(3); 49 C.F.R. § 579.21.

62. The Safety Act further requires immediate action when a manufacturer determines or should determine that a safety defect exists. *United States v. General Motors Corp.*, 574 F. Supp. 1047, 1050 (D.D.C. 1983). A safety defect is defined by regulation to include any defect that creates an "unreasonable risk of accidents occurring because of the design, construction, or performance of a motor vehicle" or "unreasonable risk of death or injury in an accident." 49 U.S.C. § 30102(a)(8). Within five days of learning about a safety defect, a manufacturer must notify NHTSA and provide a description of the vehicles potentially containing the defect, including "make, line, model year, [and] the inclusive dates (month and year) of manufacture," a description of how these vehicles differ from similar vehicles not included in the recall, and "a summary of all warranty claims, field or service reports, and other information" that formed the basis of the determination that the defect was safety related. 49 U.S.C. § 30118(c); 49 C.F.R. § 573.6(b)-(c). Then, "within a reasonable time" after deciding that a safety issue exists, the manufacturer must notify the owners of the defective vehicles. 49 C.F.R. §§ 577.5(a), 577.7(a). Violating these notification requirements can result in a maximum civil penalty of $15,000,000. 49 U.S.C. § 30165(a)(1). GM has provided no such notification with respect to the CP4 fuel pump failure, despite having knowledge of the inherent safety risks associated with the defect in GM-brand diesel vehicles.

**D.  GM's Knowledge of Incompatibility, Defectiveness, and Catastrophic Failures Associated with Bosch's CP4 Pump in Duramax Diesel Vehicles**

63. Incidents involving CP4 implosions in the Class Vehicles came rolling in almost as soon as the vehicles were off the assembly line. To be sure, GM has had notice of *scores* of

consumer complaints regarding the now-notorious CP4 pump failure, and is notorious for blatantly refusing to take responsibility for its own defective vehicle design.

64.     For example, on October 5, 2010, a Duramax Forum member posted the following regarding a nearly brand-new 2011 Chevrolet Silverado 3500 Crew Cab 6.6L Duramax:

> "I['] ve got 3200 miles on my 2011 3500 srw, crew cab, 4x4, z71, duramax. And [I']ve already got- in my opinion a serious[] problem- it won[']t start. Cranks and Cranks and cranks. Usually it finally starts. After extensive diagnostic review, the dealer and the chief duramax engineer from gm feel it[']s an Injector Pump issue . . . . Of course the part is back ordered. Any one else had similar issues? I[']m pretty frustrated."[24]

65.     In the same vein, on October 13, 2013, the owner of a 2011 GMC Sierra HD 2500 posted the following on the diesel enthusiast website TheDieselPageForums.com: "My 2011 GMC 2500HD recently experienced what has been diagnosed at a GM dealership as a high pressure fuel pump failure . . . a bit of a loss of confidence in the reliability of the bullet proof 6600 Durmax here . . . ."[25] The truck owner went on to note the following diagnosis from his GM service advisor:

> "CONTAMINATED FUEL SYSTEM CAUSED BY HIGH PRESSURE PUMP FAILURE[.] CRANK NO START-SCAN PCM, NO FAILURE CODES. CHECK CRANK SENSOR OPERATION AND CRANKING RPM'S-HAS NORMAL CRANKING SPEED AND RPM'S. CHECK FUEL API RATING-API OF 40. INSPECT FOR FUEL LEAKS AND AIR IN FUEL SYSTEM-NO AIR AND NO FUEL LEAKS. CHECK FUEL PRESSURE WHILE CRANKING...INSTALL PRESSURE GUAGE AT FUEL TEST PORT AND AND PUMP TO 10 PSI WITH FUEL PRIMER PUMP-CRANK ENGINE FUEL PRESSURE DOES NOT DROP. CALL TAC. **INSPECT FUEL PRESSURE REGULATOR AND SENSORS FOR METAL DEBRIS. FOUND FUEL SYSTEM**

---

[24] Oct. 5, 2010, DuramaxForum.com thread post entitled, "2011 Injector Pump failure," available at https://www.duramaxforum.com/forum/11-16-lml-duramax-powertrain/72500-2011-injector-pump-failure.html (last accessed Nov. 16, 2018).

[25] Oct. 30, 2013, TheDieselPageForums.com thread post entitled, "High Pressure Fuel Pump Failure at 50K," available at https://www.thedieselpageforums.com/tdpforum/archive/index.php/t-42676.html (last accessed Nov. 17, 2018).

**CONTAMINATED WITH METAL FROM HIGH PRESSURE FUEL PUMP**. SEE PIP5133, PIP5151, PIP4949C . . . ."[26]

66.     Similarly, on July 2, 2014, the following customer complaint involving a 2012

GMC Sierra 3500 HD was filed with NHTSA:

> "DRIVING FROM GM DEALER FOR TWO MILES CHANGE FUEL FILTER MESSAGE APPEARED AND ENGINE DIED. TOWED TO A DEALER DIAGNOSED AS A HIGH PRESSURE INJECTOR PUMP FAILURE WITH METAL CONTAMINATION TO FUEL SYSTEM. I HAVE FOUND A BULLETIN DATED 2009 FROM EQUIPMENT MANUFACTURERS. THIS JOINT STATEMENT HAS INFORMATION ABOUT THE FUEL USED IN THE USA THAT I WAS NOT AWARE OF AND MAY HAVE AVOIDED THIS FAILURE. THIS IS A VERY EXPENSIVE REPAIR AS I USE MY TRUCK FOR WORK. *TR"[27]

67.     Likewise, on August 5, 2014, the owner of a 2012 Chevrolet Silverado 2500 filed

a complaint with NHTSA about the following incident which occurred on July 11, 2014, in

Chualar, California:

> VEHICLE WOULD NOT START. WHEN THEY PUT IT ON SCOPE THEY FOUND THAT THE FUEL RAIL PRESSURE WAS TO LOW. **THEY FOUND METAL SHAVINGS THROUGHOUT THE FUEL SYSTEM AS IF A PART WAS COMING APART FROM THE INSIDE**. THEY HAD TO REPLACE ENTIRE FUEL SYSTEM FROM PUMP TO INJECTORS PLUS ALL THE LINES AND INJECTION PUMP. THIS VEHICLE IS 2 YEARS OLD. *TR[28]

68.     On February 7, 2015, the following "catastrophic failure" caused by the CP4 pump

in a 2012 GMC Sierra Duramax truck was reported to NHTSA:

> "**THE FUEL INJECTION PUMP CP4 HAD A CATASTROPHIC FAILURE AS I WAS DRIVING ON A HEAVILY TRAVELED FOUR LANE HIGHWAY**, US RT.20. I LOST POWER STEERING AND BRAKES. I FELT FORTUNATE THAT I WAS NOT TOWING A 16,000 LB. FIFTH WHEEL CAMPER DOWN A MOUNTAIN ROAD.I SAY THIS BECAUSE IT WAS EXTREMELY DIFFICULT TO MAINTAIN CONTROL OVER THE TRUCK STEERING IT AND BRINGING IT TO A CONTROLLED STOP. I HAVE READ ABOUT THESE PUMPS FAILING ON NUMEROUS DIESEL FORD

---

[26] *Id.* (emphasis added).
[27] NHTSA ID No. 10607796.
[28] NHTSA ID No. 10619113 (emphasis added).

AND GM TRUCKS. I ALSO FEEL IF A WOMAN OR SMALL PERSON HAD THIS HAPPEN TO THEM THE OUTCOME COULD END IN LOSS OF CONTROL RESULTING IN INJURIES EVEN DEATHS. THE ONLY ONE THAT KNOWS THE ACTUAL NUMBER OF PUMPS THAT HAVE FAILED IS THE MANUFACTURERS, WHO WILL NOT SHARE THAT INFORMATION WILLINGLY. *JS"[29]

69.     On May 4, 2015, the following report regarding a 2011 GMC Sierra Duramax HD

was filed with NHTSA:

"VEHICLE WAS TRAVELING DOWN ACCESS ROAD COMING UP TO INTERSTATE OFFRAMP. **RIGHT BEFORE YIELD SIGN BOSCH CP4 PUMP FAILED STOPPING MOTOR**. BRAKES AND STEERING AFFECTED. JUST ENOUGH MOMENTUM TO FIGHT TRUCK INTO ADJACENT PARKING LOT RIGHT AFTER RAMP. *TR"[30]

70.     Similarly, on June 13, 2016, the owner of a 2012 Chevrolet Silverado submitted

the following complaint to NHTSA regarding the defective condition:

"I WAS DRIVING DOWN A HIGHWAY ROAD WHEN MY VEHICLE ABRUPTLY LOST POWER, I RECEIVED A WARNING FROM MY DASHBOARD SAYING FUEL FILTER NEEDS REPLACING AND SUBSEQUENTLY LOST ENGINE POWER WHICH RESULTED IN NO POWER STEERING AND NO BRAKES. I WAS ABLE TO KEEP THE VEHICLE UNDER CONTROL AND GOT IT TO THE SIDE OF THE ROAD BEFORE IT BECAME DEAD. **AFTER GETTING THE VEHICLE TOWED TO A GARAGE IT WAS DETERMINED THAT THE CP4 FUEL INJECTION PUMP HAD FAILED RESULTING IN FUEL BEING STARVED FROM THE ENGINE AND THE RESULT WAS THE ENGINE SHUTTING OFF.** THE REPAIRS ALONE FOR THIS SINGLE FAILURE ARE $8550 BECAUSE THIS PUMP HAS FOULED ALL THE FUEL INJECTORS AND REGULATORS IN THE FUEL SYSTEM. MOST IMPORTANTLY THOUGH, I WAS FORTUNATE ENOUGH TO BE IN A POSITION ON HIGHWAY WHERE I HAD NO TRAFFIC BEHIND ME, AND ON A RELATIVELY STRAIGHT ROAD WHERE I WAS ABLE TO GET TO THE CURB BEFORE IT BECOME A BIGGER PROBLEM. FROM WHAT I HAVE FOUND THIS IS BECOMING A COMMON PROBLEM ON ALL OF THE DURAMAX 6.6L LML ENGINES UTILIZING THIS TYPE OF FUEL INJECTION PUMP AND GM NEEDS TO RECALL THESE SYSTEMS AND REPAIR THEM. I DO NOT HAVE THE REPAIR INVOICE YET BECAUSE

---

[29] NHTSA ID No. 10681960 (emphasis added).
[30] NHTSA ID No. 10714457 (emphasis added).

THE VEHICLE IS STILL BEING REPAIRED BUT WILL BE HAPPY TO SUPPLY IT WHEN I RECEIVE IT."[31]

71.     On December 19, 2016, the owner of a 2012 Chevrolet Silverado 2500 reported the

following failure to NHTSA:

"TL* THE CONTACT OWNS A 2012 CHEVROLET SILVERADO 2500. WHILE DRIVING 10 MPH, THE VEHICLE STALLED WITHOUT WARNING. THE VEHICLE WAS TOWED TO THE DEALER TO BE DIAGNOSED. THE CONTACT WAS INFORMED THAT THERE WAS METAL CONTAMINATION IN THE FUEL SYSTEM DUE TO A FUEL PUMP FRACTURING IN THE FUEL TANK. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 130,000."[32]

72.     On December 28, 2016, the owner of a 2016 GMC Sierra 2500 reported the

following to NHTSA regarding an incident that occurred on November 27, 2016:

"TL* THE CONTACT OWNS A 2016 GMC SIERRA 2500. WHILE DRIVING APPROXIMATELY 15 MPH, THE ENGINE STALLED WITHOUT WARNING. THE VEHICLE WAS TOWED TO A DEALER WHERE IT WAS DIAGNOSED THAT THE FUEL INJECTOR PUMP FAILED AND NEEDED TO BE REPLACED. THE VEHICLE WAS REPAIRED. THE MANUFACTURER WAS INFORMED OF THE FAILURE. THE VIN WAS UNKNOWN. THE APPROXIMATE FAILURE MILEAGE WAS 11,000."[33]

73.     Likewise, on January 9, 2017, the owner of a 2013 GMC Sierra 2500 submitted the

following complaint to NHTSA regarding the defective condition:

"**BOSCH CP4 FUEL PUMP FAILURE**. PLEASE REFERENCE EA11-003 AND FIND THE SAME FUEL PUMPS THAT WERE FOUND TO FAIL ON AUDI/VW VEHICLES ARE ALSO USED ON GM, FORD, AND DODGE VEHICLES. SAID PUMP FAILED DURING DRIVING WITHOUT WARNING CAUSING COMPLETE ENGINE SHUTDOWN AND LOSS OF POWER. CERAMIC AND METAL INTERNALS OF THE PUMP DISINTEGRATED AND TRAVELED THROUGH THE FUEL SYSTEM, SUBSEQUENTLY CAUSING THE INJECTORS TO FAIL. SIMILAR TO THE FINDINGS IN

---

[31] NHTSA ID No. 10873931 (emphasis added).
[32] NHTSA ID No. 10936256.
[33] NHTSA ID No. 10937972.

EA11-003, PAGE 16 PARAGRAPH 2, THE REPAIR IS TO COST APPROXIMATELY $10,000 TO FIX THE ENTIRE FUEL SYSTEM. *TR"[34]

74.     Similarly, on March 15, 2017, the owner of a 2012 Chevrolet Silverado 3500

submitted the following complaint to NHTSA regarding the defective condition:

"WHILE DRIVING ON A FOUR-LANE HIGHWAY TOWING OUR 15,500 LB FIFTH WHEEL, SUDDENLY, WITHOUT ANY WARNING, WE HEARD RATTLING, LOST POWER, AND THE ENGINE SHUT DOWN. THE NOISE AND LOSS OF PROPULSION, POWER STEERING AND POWER BRAKES ALL OCCURRED WITHIN ABOUT 2-3 SECONDS. GRATEFULLY, THE DRIVER HAD THE FORTITUDE TO IMMEDIATELY BEGIN PULLING ONTO THE SHOULDER OF THE SLIGHT DOWNWARD SLOPE ON WHICH WERE [SIC] DRIVING. LUCKILY, WE WERE ON A STRETCH OF ROAD THAT WAS NOT INCLINED, NOT IN A CONSTRUCTION ZONE WITH BARRIERS, NOT IN A SNOWY MOUNTAIN PASS OR IN OTHER INCLEMENT WEATHER, NOT IN THE LEFT LANE PASSING, ETC. HAD ANY OF THESE FACTORS PREVENTED US FROM SIMPLY PULLING ONTO THE SHOULDER OF THE ROAD, THE POTENTIAL FOR A LIFE THREATENING ACCIDENT WOULD HAVE BEEN SIGNIFICANT. **THE CHEVROLET/GM SERVICE CENTER CONFIRMED THE BOSCH CP4 HPFP SUFFERED A CATASTROPHIC FAILURE, DESTROYING THE ENTIRE FUEL SYSTEM OF THE TRUCK.** GM IS COVERING PART OF THE REPAIR COSTS (TRUCK IS AT 119,705 MILES), BUT OUR BILL WILL REMAIN SUBSTANTIAL. RESEARCH OF DIESEL, TDI, AND OTHER FORUMS DOCUMENT THIS PROBLEM AS WELL-KNOWN AND BROADER THAN THE EXISTING 9 COMPLAINTS IN THE NHSTA PUBLIC DATABASE AND THE INVESTIGATION OF VW/AUDI. SOME PEOPLE ARE EVEN REPORTING MULTIPLE FAILURES. THE MOST COMMON BELIEVABLE CAUSE OF THE FAILURES SEEMS TO BE A MISMATCH OF LUBRICITY SPECS BETWEEN THE BOSCH CP4 AND THE DIESEL FUEL IN THE U.S. PLEASE OPEN AN INVESTIGATION, AND ORDER GM, FORD, VW, BOSCH AND OTHERS TO RECALL THESE VEHICLES TO PROVIDE THE NECESSARY REPAIRS. ALSO PLEASE MANDATE, TO THE EXTENT YOU'RE ABLE, REIMBURSEMENT TO THOSE OF US PAYING FOR REPAIRS TODAY. I HAVE READ, BUT HAVE NOT BEEN ABLE TO CONFIRM, THAT VW EXTENDED THE WARRANTY TO 120K MILES. THIS SEEMS LIKE A MINIMUM (MORE IS BETTER) STEP, AND IT SHOULD BE RETROACTIVE."[35]

75.     On May 26, 2017, the owner of a 2012 GMC Denali Duramax Sierra 2500 posted

---

[34] NHTSA ID No. 10943828 (emphasis added).
[35] NHTSA ID No. 10966092 (emphasis added).

the following on DuramaxForum.com:

> "So I have a 2012 GMC Denali Duramax with 116k on the odometer. A couple of weeks it just stopped working while driving. We had it towed to the dealer and they took a look at it and stated the fuel pump 'blew' up and contaminated the entire fuel delivery system. They want to replace the entire fuel system as well as put in an 'upgraded' GM pump for about $7100."[36]

76.     In the same vein, diesel truck owners in the online forum DieselPlace.com lamented their woes in the following conversation thread entitled, *"Have they fixed the CP4 issue yet?"*

> • "[My 2015 GMC LML] just blew up at 68k. Sent metal through the whole fuel system. [$]10.5K to fix."

> • "There is nothing NORMAL about a +$10k repair bill . . . .  If CP4s failed like CP3[']s nobody would be talking about it. But the fact they puke with no [failsafe] is the real issue. When people are having to take out 2nd mortgages to get their truck repaired there's a problem with that."[37]

77.     Along these same lines, in January 2015, the owner of a 2015 GMC Sierra 3500 began a thread on the DuramaxForum.com stating as follows:

> "I have a new 2015 GMC 3500 with 14k miles that the injection pump crapped out on me. Dealer has had it for 3 1/2 weeks. Was told if they find any metal they would have to tear the engine down. Well they found metal but didn't tear it all the way down. Has anyone else had an issue [with] the injection pump on the 2015 Duramax[?]"[38]

78.     Shortly thereafter, the following response comes in from a fellow DuramaxForum.com user: "[L]ots of LML's have had injector pump issues in the states[,] go down to the LML [forum] and read, it[']s caused by the new cp4.2 pump that needs better fuel then what

---

[36] May 26, 2017, DuramaxForum.com thread entitled, "Injection CP4 pump failure," available at https://www.duramaxforum.com/forum/11-16-lml-duramax-powertrain/909393-injection-cp4-pump-failure.html (last accessed Nov. 7, 2018).
[37]     https://www.dieselplace.com/forum/63-gm-diesel-engines/365-duramax-fifth-generation-2011-2016-lml/794162-have-they-fixed-the-cp4-issue-yet.html (last accessed Nov. 3, 2018).
[38]     *See*     https://www.duramaxforum.com/forum/general-discussion/560786-2015-duramax-injection-pump-troubles.html (last accessed Nov. 3, 2018).

you can buy."[39]

79.    Notably, the initial complainant then explained how he finally got his truck back after a series of fuel line/tank line/chassis line flushes and replacements by the dealership, including a fuel pump injector replacement: "[I]t was around [an $]8000.00 job and that was warranty price."[40]  One DuramaxForum.com user aptly responded, "To[o] bad the dealers won[']t just install a cp3 instead of the crappy cp4 when these go out in the lml[]s.  It only makes sense!!!"[41]

80.    Along the same lines, on August 3, 2017, the owner of a 2012 Chevrolet Silverado 2500 submitted the following complaint to NHTSA regarding the defective condition:

**"BOSCH CP4.2 FUEL PUMP MALFUNCTIONED AND CONTAMINATED THE ENTIRE FUEL AND INJECTION SYSTEM WITH METAL SHAVINGS.** THE TRUCK ENGINE STOPPED WHILE TRAVELING AT 50 MPH ON A CITY STREET AND LEFT ME WITH NO POWER STEERING. THE ENTIRE FUEL SYSTEM NEEDS TO NOW BE REPLACED AND NOT COVERED BY THE MANUFACTURER. REPAIR BILL OF OVER $7,000."[42]

81.    On November 13, 2017, the following incident involving a 2014 GMC Sierra 2500HD Duramax truck was filed with NHTSA:

"MY FUEL PUMP AND INJECTORS FAILED WHILE I WAS DRIVING, STRANDING MY TRUCK IN THE MIDDLE OF TRAFFIC RIGHT WHERE A CITY STREET WAS CHANGING TO A COUNTRY ROAD. THE GMC DEALERSHIP FALSELY CLAIMED THAT THIS WAS CAUSED BY USING UNAPPROVED FUEL. THE FUEL I USED WAS B20 BIODIESEL, WITH 80% RENEWABLE DIESEL, WHICH MEETS DIESEL SPECIFICATIONS AND IS A LEGAL ROAD FUEL IN CALIFORNIA. THEY ALSO CLAIMED THAT A CASCADE OF OTHER PROBLEMS WERE ALL CAUSED BY MY FUEL AND REFUSED TO APPLY MY WARRANTY."[43]

82.    On April 10, 2018, the following customer complaint involving a 2016 Chevrolet

---

[39] *See id.*
[40] *Id.*
[41] *Id.*
[42] NHTSA ID No. 11012551 (emphasis added).
[43] NHTSA ID No. 11045708.

Silverado 3500 diesel truck was filed with NHTSA:

> "TL* THE CONTACT OWNS A 2016 CHEVROLET SILVERADO 3500. WHILE DRIVING 40-45 MPH, THE REDUCED ENGINE SPEED WARNING INDICATOR ILLUMINATED AND THE VEHICLE STALLED. THE CONTACT WAS UNABLE TO RESTART THE VEHICLE. THE VEHICLE WAS TOWED TO HERB EASLEY MOTORS (1125 CENTRAL E FWY, WICHITA FALLS, TX 76306, (940) 723-6631) WHERE IT WAS DIAGNOSED THAT THE FAILURE WAS DUE TO CONTAMINATION OF METAL SHAVINGS IN THE FUEL PUMP AND FUEL RAILS. IN ADDITION, THE FAN CLUTCH FAILED AND NEEDED TO BE REPLACED, INCLUDING THE ENTIRE FUEL SYSTEM. THE VEHICLE WAS REPAIRED, BUT THE FAILURE RECURRED SEVERAL MONTHS LATER. THE VEHICLE WAS TAKEN BACK TO THE DEALER WHERE IT WAS DIAGNOSED THAT THE FUEL SYSTEM NEEDED TO BE REPLACED AGAIN. THE VEHICLE WAS NOT REPAIRED DUE TO COST. THE MANUFACTURER WAS NOTIFIED OF THE FAILURES AND CASE NUMBER: 8-4064184145 WAS OPENED. THE APPROXIMATE FAILURE MILEAGE WAS 38,000."[44]

83.     On April 17, 2018, the following report was submitted to NHTSA on behalf of the

owner of a 2013 GMC Sierra 3500:

> "TL* THE CONTACT OWNS A 2013 GMC SIERRA 3500. THE CONTACT STATED THAT THE VEHICLE FAILED TO START. THE VEHICLE WAS TOWED TO KUHIO CHEVROLET CADILLAC HYUNDAI NISSAN (3033 AUKELE ST, LIHUE, HI 96766, (808) 245-6731) WHERE IT WAS DIAGNOSED THAT THE FUEL PUMP AND INJECTORS FAILED AND NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS CONTACTED AND DID NOT ASSIST. THE APPROXIMATE FAILURE MILEAGE WAS 34,500. THE VIN WAS NOT AVAILABLE."[45]

84.     On November 12, 2018, the owner of a 2011 Chevrolet Silverado 2500 submitted

the following complaint to NHTSA regarding the defective condition:

> "I WAS TRAVELING TO WORK IN THE FAST LANE OF THE FREEWAY WHEN I HEARD A FAINT SQUEALING NOISE AND THE TRUCK SUDDENLY STARTED RUNNING ROUGH. I BEGAN CROSSING ALL 4 LANES AND BY THE TIME I MADE IT TO THE [SIC] SLOW LANE THE TRUCK COMPLETELY DIED. I WAS ABLE TO SAFELY COAST OFF OF

---

[44] NHTSA ID No. 11084287.
[45] NHTSA ID No. 11088735.

THE FREEWAY DUE TO MY QUICK REACTION AND LACK OF TRAFFIC AT THE TIME, BUT THE SITUATION WAS VERY DANGEROUS AND COULD HAVE BEEN MUCH MORE SO WITH HEAVIER TRAFFIC OR A LESS AWARE DRIVER. **LATER DIAGNOSIS AT THE CHEVROLET DEALERSHIP TOLD ME THAT THE CP4 FUEL PUMP DISINTEGRATED INSIDE. AFTER SPEAKING WITH THE DIESEL TECHNICIAN AT THE DEALER I LEARNED THAT IT IS A VERY COMMON PROBLEM AND THE REPAIR COMES WITH A $10,000 PRICE TAG.** I WAS ALSO VERY SURPRISED THAT THERE HAS NEVER BEEN A RECALL FOR THIS PROBLEM AND GM CONTINUED TO USE THEM UNTIL 2017...7 YEARS! MY TRUCK IS A 2011 WITH ONLY 54K MILES, AND THEY JUST FIXED A 2017 WITH ONLY 7K MILES! I HAVE SINCE DONE A LOT OF RESEARCH FINDING HUNDREDS OF LOW MILEAGE GM DURAMAX DIESEL BETWEEN 2011-2017 WITH THE EXACT SAME FAILURE. I WAS ABLE TO GET THE BOTTOM OF THE FAILURE ITSELF AND I FOUND THE FOLLOWING...THE BOSCH CP4 FUEL PUMPS THAT WERE USED IN THESE TRUCKS (ALSO FOUND IN LATE FORD AND VW DIESELS) ARE MADE IN EUROPE TO DIFFERENT SPECIFICATIONS. THE PUMPS RELY ON LUBRICANT FOUND IN DIESEL #1 TO OPERATE SMOOTHLY AND LAST A LONG TIME. HERE IN THE U.S. WE ONLY HAVE DIESEL #2 WHICH LACKS THAT LUBRICANT AND CAUSES THE INTERNAL PARTS OF THE PUMP TO DISINTEGRATE SENDING METAL SHAVINGS THROUGHOUT THE ENTIRE FUEL SYSTEM. THIS IS WHY THE REPAIR AVERAGES $10,000 ACROSS THE COUNTRY, THE ENTIRE FUEL SYSTEM BECOMES CONTAMINATED AND HAS TO BE REPLACED. I CONTACTED GM AND THEY DON'T BELIEVE THIS IS A SAFETY ISSUE. A VEHICLE SUDDENLY DIEING WITH SECONDS NOTICE ON THE FREEWAY IS CERTAINLY A SAFETY ISSUE IN MY EYES. ESPECIALLY WHEN IT'S A COMMON FAILURE THAT CAN BE PREVENTED."[46]

85.     Notably, in August 2014, GM issued an internal "Preliminary Information" service bulletin to dealers—but *not* consumers—regarding the following vehicles equipped with the 6.6L Duramax Diesel RPO codes LGH and LML: 2010–15 Chevrolet Express van, 2010–15 Chevrolet Silverado, 2010–15 GMC Savana van, and the 2010–15 GMC Sierra.[47]  The bulletin's subject was, "Duramax Diesel Hard Start No Start P0087 P0088 P0191 P128E Or Injection Pump

---

[46] NHTSA ID No. 11150932 (emphasis added).
[47] *See* Aug. 2014 GM Service Bulletin PIP4949D, Preliminary Information regarding "Duramax Diesel Hard Start No Start P0087 P0088 P0191 P128E Or Injection Pump Replacement," available at https://static.nhtsa.gov/odi/tsbs/2014/SB-10044240-3551.pdf (last accessed Nov. 18, 2018).

Replacement," and stated that if a customer with one of the aforementioned vehicles came into a dealership with "a hard start or a no start" problem, and the normal diagnostic procedure led the dealer to conclude that fuel injection pump replacement was necessary, "Fuel Pressure Regulator 1 must be inspected for magnetic metal debris" as well.[48]  In other words, simply replacing the fuel injection pump would not completely solve the problem because metal shavings would have contaminated the entire fuel injection system.  The bulletin directed dealers to remove the fuel injection pump and pressure regulator and "inspect[] for magnetic metal debris," and if metal debris was found, GM required its dealers to retain the affected fuel system components which "will be requested back for an engineering inspection."[49]  The following photographs of a contaminated fuel pressure regulator were provided as examples of the condition having manifested—and metal shavings can be seen throughout:[50]





86.     Rather than issue a recall, in March 2017 GM went on to reissue the Preliminary Information as Technical Service Bulletin #16-NA-102, expanding the affected model years to include the 2016 model year.[51]

87.     Tellingly, GM stopped equipping the Class Vehicles with the CP4 pump after the 2016 model year, opting instead for the Denso HP4 fuel injection pump[52]—a design that has been available for medium and large-sized trucks since at least the 2004 model year.[53]

---

[51] Mar. 2, 2017, GM Technical Service Bulletin #16-NA-102: Duramax Diesel Hard Start, No Start, DTCs P0087, P0088, P0191, P128E or Injection Pump Replacement, Document ID: 4474673, available at https://f01.justanswer.com/Bluegorilla/53288260-1d95-4c61-94ef-9cbd4868f4c1_My_Boot_Camp_printed_document.pdf (last accessed Nov. 18, 2018).

[52] See, e.g., Nov. 1, 2017, "Everything You Need to Know About the 2017 Silverado HDS," Ultimate Diesel Builder's Guide, available at https://www.pressreader.com/usa/ultimate-diesel-builders-guide/20171101/281535111145444 (last accessed Nov. 18, 2018) ("Breaking away from Bosch for the first time, the [2017] L5P Duramax makes use of a high-pressure common-rail fuel system from Denso. At the heart of the system rests a Denso HP4 injection pump. . .").

[53] See, e.g., Sept. 2007 Denso Diesel Injection Pump Service Manual for Common Rail System (CRS) Operation, Sec. 1.5 ("Common Rail System And Supply Pump Transitions"), available at http://steldiesel.ru/files/crdensoservismanual.pdf (last accessed Nov. 18, 2018) ("In 2004, the three-cylinder HP4 based on the HP3 was introduced"); Dec. 2013 Denso Diesel Systems & Diagnostics, Technical News Bulletin, Issue 1, at 1, available at http://www.denso.ro/media/151806/2013_technical-service-bulletin_no-01.pdf (last accessed

### E. Supposed "Remedies" are Insufficient and Costly

88.     Because of its incompatibility with U.S. diesel fuel, CP4 pumps and corresponding fuel injection systems, even when replaced or "fixed," will continue to fail in the Class Vehicles. Indeed, in a June 2010 email chain between Bosch and representatives of Audi and Volkswagen regarding the failure of a CP4 pump in a 2010 Audi A3 TDI, Audi asked Bosch, "[W]hy are the defects mentioned below still present after replacing the high-pressure pump and the injector? What could the [dealer] have done wrong by way of incorrect repair so that such defects are appearing?" Bosch responded that "In this case the complete fuel system (HPP, rail, injectors, **all** lines) need to be changed . . . .  I assume that because of the 'cruncher,' the entire system is contaminated with chips, which are then pumped in circulation and can soon lead to the next failure! The rough running can be explained by the fact that a chip is already present before or in the injector and is impairing its function."[54]

89.     The Bosch CP4 Pump problem is so prevalent that several automotive parts sellers now provide kits to mitigate the inevitable harm.  "Disaster Preventer Kits" or "bypass kits" usually refer to a fuel bypass system that does not prevent the failure, the loss of the expensive injection pump, or the need to clean metal shavings from the fuel system.  But these kits are designed to redirect the lubricating fuel for the CP4 back to the fuel tank, so that it will be filtered before it returns to the engine.  The bypass kit directs the fuel contaminated with metal shavings into the

---

Nov. 18, 2018) (showing different types of Denso high-pressure pumps and their range of applications, including the HP4, beginning in the 2004 2nd Generation Common Rail System).

[54] Mar. 7, 2011 Bosch submission to NHTSA in response to Inquiry No. INRD-EA11003, document entitled, "INRD-EA11003-59347P.pdf," at 79-80 (Jun. 7-9, 2010 email chain between Bosch, Audi, and Volkswagen representatives regarding CP4 fuel pump failure falsely attributed to "misfuel").

gas tank, which is less expensive to clean than the engine and high-pressure fuel system—in other words, a "Band-Aid" solution. These bypass kits are also less expensive than more complete remedies, requiring only $300-$400 in parts, and are marketed as having the ability to "[p]revent CP4 failures from contaminating the high pressure fuel system."[55] Many consumers have turned to this sort of remedy preemptively due to the known impending failures their vehicles are facing.

90.     Another method of addressing the Bosch CP4 Pump failure is to modify the Class Vehicles to return to the older, more reliable technology of simply using more fuel.  With Duramax engines, the strategy may be simply to buy a predecessor CP3 pump from an independent automotive parts vendor and install it in place of the Bosch CP4 Pump.  Indeed, the CP4 pump is so substandard that many Class Vehicle owners have opted to replace their CP4 pumps with CP3 pumps at a cost of at least $3,000 per vehicle for the replacement parts alone.[56]  Resorting to this "remedy" fails to make consumers whole because they are not getting the fuel efficiency promised with the Bosch CP4 Pump, and for which they paid a premium.  Further, consumers are having to pay thousands of dollars out of pocket to essentially redesign a design flaw that was implemented by GM in the Class Vehicles.

---

[55] Online sales listing for "2011-2016 LML CP4 Fuel Bypass Kit," PerformanceFueled.com, available at http://performancefueled.com/cp4-fuel-bypass-kit/ (last accessed Nov. 16, 2018).
[56]     *See*,  *e.g.*,   http://www.engineered-diesel.com/lml-duramax-cp3-conversion-kit-with-re-calibrated-pump-50-state-carb-certified (selling "LML Duramax CP3 Conversion Kit with re-calibrated Pump[s]" for $3,000.00 and noting that the "[k]it is designed to replace the less reliable CP4 that comes stock on the LML"); https://www.dieselpowerproducts.com/p-15627-industrial-injection-436403-cp4-to-cp3-injection-pump-conversion-kit-tuning-required-11-16-66l-gm-duramax-lml.aspx (selling an "Industrial Injection CP4 to CP3 Injection Pump Conversion Kit" for 2011-2016 6.6L GM Duramax LML and noting, "With the release of the LML Duramax in 2011, GM made the switch from the reputable CP3 injection pump to the lower output CP4 pump, simply because they deemed it was 'good enough.' Is 'good enough' good enough for you and your truck? We've seen numerous failures on the CP4 on stock trucks, let alone even slightly modified trucks that chew them up and spit them out. Industrial Injection has this complete conversion kit that delivers everything you need to swap out your failure prone CP4 to a dependable CP3").

91.     Another supposed "remedy" is to leave the CP4 in place on the Class Vehicle, but install a lift pump, a second pump to assist the Bosch CP4 Pump and increase the fuel pressure. But, again, this "remedy" deprives consumers of the fuel-efficiency for which they paid a premium.

92.     The lift pump and CP3 pump options remedy part of the problem by pumping and burning more fuel.  So, in addition to the expense of buying a new fuel injection pump, the "remedies" would require owners to purchase more fuel.

93.     A fourth way to mitigate the damage is to spend money for fuel additives to increase the lubricity of the fuel.  This approach may work best in conjunction with the previously discussed modifications, but even by itself, it can be expensive.

94.     In short, there is no known way to remedy or mitigate CP4 pump failure without decreasing the fuel efficiency promised to Plaintiffs and other Class members and without significant expense to Plaintiffs and other Class members.


## F. GM Knew Durability and Superiority Were Material to Consumers and Made Hollow Promises of Durability and Superiority.

95.     When it first came on the scene in 2010, GM announced that its new 6.6 liter Duramax V-8 diesel engine for 2011 model year Chevrolet Silverado and GMC Sierra heavy duty trucks would be 11 percent more fuel efficient than its previous Duramax diesel engines, with "a mind-blowing 765 pounds-feet of torque."[57]  In a press release, GM's chief Duramax engineer, Gary Arvan, proclaimed, "[W]e've enhanced the Duramax to make it one of the most competitive engines in the segment—one that takes performance and fuel economy to the next level.  Whether

---

[57] Mar. 9, 2010, "GM Announces Best-in-Class Power Figures for 2011 6.6-liter Duramax V-8 Diesel," PickupTrucks.com, available at https://news.pickuptrucks.com/2010/03/gm-announces-best-in-class-power-figures-for-2011-duramax-v8-diesel.html (last accessed Nov. 17, 2018).

it's a new Sierra Denali HD or an ambulance based on a Sierra chassis cab, customers will find the Duramax is the power behind the greater capability these trucks offer."[58]

96.    GM's 2011 Chevrolet Silverado HD truck brochure boasted of an eleven-percent increase in fuel efficiency while claiming the durability of its predecessors, "PROVEN DURABILITY[:] The Duramax-Allison combination continues to build on its proven reliability."

97.    GM's 2011 Chevrolet Silverado HD brochure further emphasized that GM had "engineered the new 2011 Silverado HD with durable, advanced technology that makes this [their] **most powerful heavy-duty ever.**" GM also provided an express "100,000 mile/5-year Powertrain Warranty to guarantee the quality." The brochure further stated "[t]he new Silverado HD. From Chevrolet—the most dependable, longest-lasting full-size pickups on the road."

98.    Moreover, this brochure expressly stated that the Duramax diesel engine in the 2011 Silverado could run on "B20 biodiesel. . . which is composed of 20% biodiesel mixed with regular diesel[:]"[59]

---

[58] Mar. 10, 2010, "GMC's 2011 Heavy-Duty Trucks Build on Proven Heritage with New Duramax 6.6L Turbo Diesel Engines," <u>GM Pressroom</u>, available at https://media.gm.com/media/us/en/gmc/vehicles/sierra_hd/2011.detail.html/content/Pages/news/us/en/2010/Mar/0310_gmc_sierra_hd/0310_duramax.html (last accessed Nov. 17, 2018).
[59] 2011 Chevrolet Silverado HD Vehicle Brochure, at 5, available at http://www.auto-brochures.com/makes/Chevrolet/Silverado/Chevrolet_US%20SilveradoHD_2011.pdf (last visited Nov. 16, 2018).



# FOR HEAVY-DUTY TRUCKS, TORQUE IS KING.

STRONGER

**B20 BIODIESEL**
The available Duramax Diesel can run on B20 biodiesel, a fuel that's produced using domestic, renewable resources. B20 is composed of 20% biodiesel mixed with regular diesel. The new, available Duramax runs cleaner too, with a 60% reduction in NOx emissions from our previous model. That's thanks to an optimized Diesel Emissions Fluid (DEF) system. The combustion system and after-treatment have also been optimized, offering up to 700 miles between Diesel Particulate Filter (DPF) regenerations.





The crown jewel of the heavy-duty realm is the Duramax 6.6L Turbo-Diesel V8 engine. But to remain an HD leader, we decided to look at everything that made the available Duramax great and make it even better. This proven powerplant was enhanced to generate **more maximum horsepower and torque than ever before** – an incredible 397 hp and 765 lb.-ft. of torque – yet our engineers managed to make it quieter than before and **improve highway fuel economy by more than 11%!** Remarkably, when you take that improvement and combine it with our 36-gallon fuel tank, it offers **up to 680 highway miles on a single tank.** Harnessing all that power and efficiency is the renowned, beefed-up **Allison six-speed,** a transmission that's been earning its heavy-duty credentials for nearly a decade. And let's face it – you don't want to leave your towing fate in the hands of an unproven transmission when you're pulling a massive load through the mountains. Need more proof on just how tough Allison transmissions are? You'll find them in a lot of medium-duty commercial-grade vehicles. Another engine choice is our standard Vortec 6.0L V8 gas engine with Variable Valve Timing (VVT) that optimizes high-end power and low-end torque – enough for 360 horses and 380 lb.-ft. of torque.

Shown at right: Available Duramax 6.6L Turbo-Diesel V8 engine. Shown above: Available Allison six-speed automatic transmission. 1 Fuel or LBz only. 2 Figures in Silverado 2500 model too.

Head to chevy.com/NewSilveradoHD to see how we made Silverado HD stronger than ever.

99.     Likewise, for the 2012 GMC Sierra HD, GM actively touted the Duramax diesel engine's "advanced" high-pressure diesel direct injection system "that helps it start in as little as 3.0 seconds . . . [and] can give you a maximum highway range of up to 680 miles on a single fill-up, thanks to its extra-large 36-gallon fuel tank[:]"[60]

---

[60] 2012 GMC Sierra Vehicle Brochure, at 28, available at https://cdn.dealereprocess.net/cdn/brochures/gmc/2012-sierra.pdf (last accessed Nov. 16, 2018).



**HEAVY DUTY ENGINES**

**VORTEC 6.0L V-8 VVT (L96)** For strong, steady power at a standstill to bold acceleration on the highway, the 6.0L V-8 is up to the task and then some. Thanks to VVT technology, this engine can dig in at low speed to move a cabin cruiser up a boat ramp without complaint. It can just as easily apply its full power for safe highway passing or offer up the muscle to conquer a steep grade.

**Vortec 6.0L V-8 VVT (L96)**
HORSEPOWER: 360 hp @ 5400 rpm        TORQUE: 380 lb-ft @ 4200 rpm
FlexFuel Capable

**E85 FLEXFUEL CAPABILITY²** To give you more choices at the pump for 2012, the 6.0L V-8 (L96) is capable of running on E85 ethanol. This advanced biofuel is a mostly renewable fuel that burns cleaner than gasoline and helps to reduce the need for imported oil.

**DURAMAX DIESEL 6.6L V-8 TURBO** For off-the-chart horsepower and torque with off-the-map range, the choice is Duramax. With advanced diesel direct-injection technology that helps it start in as little as 3.0 seconds at –40°F and a sophisticated Allison transmission with overdrive, this available powertrain can give you a maximum highway range of up to 680 miles on a single fill-up, thanks to its extra-large 36-gallon fuel tank.

**Duramax Diesel 6.6L V-8 Turbo**
HORSEPOWER: 397 hp @ 3000 rpm        TORQUE: 765 lb-ft @ 1600 rpm

**DURAMAX B20 BIODIESEL CAPABILITY** To reduce carbon-dioxide emissions and stretch your fuel budget further, the Duramax 6.6L is engineered to operate on B20 biodiesel, a mixture of 20 percent biodiesel produced from domestic, renewable resources, and 80 percent petroleum diesel.

**DURAMAX HIGH-PRESSURE DIRECT INJECTION** For fast starts in cold weather, quieter operation and maximum efficiency, the direct injection system operates at nearly 30,000 psi to turn heavy diesel fuel into a fine mist, burning clean and fast with lower emissions and greater power than the previous model.

100.    GM's 2012 Chevrolet Silverado HD brochure highlights the "dependable, long-lasting workhorse of a truck that comes with the best coverage of any size pickup –a 100,000 MILE/5-YEAR POWERTRAIN WARRANTY. Because [they know] it's one thing to talk quality and quite another to back it up[:]"[61]

---

[61] 2012 Chevrolet Silverado Vehicle Brochure, at 3, available at https://cdn.dealereprocess.net/cdn/brochures/chevrolet/2012-silveradohd.pdf (last accessed Nov. 16, 2018).



Silverado 3500HD Dually,
Crew Cab Long Box LTZ 4x4
shown in Black Granite Metallic
with available features.

**AT A GLANCE**
Choice of 2WD or 4x4 models
Available Duramax® 6.6L Turbo-Diesel V8 engine
and Allison 6-speed automatic transmission
Tows up to 23,000 lbs.
Fully boxed heavy-duty frame

# JOB
# READY

Brute strength solves a lot of problems. Reason enough to build the 2012 Silverado HD—**OUR MOST POWERFUL HEAVY DUTY** yet. By teaming an available **DURAMAX® 6.6L TURBO-DIESEL V8** powerhouse with the legendary Allison® 6-speed transmission, Silverado HD delivers **397 HORSEPOWER, 765 LB.-FT. OF TORQUE** and a **MAXIMUM TOWING CAPACITY OF UP TO 23,000 LBS.**[1] Factor in a high-strength, fully boxed steel frame that's capable of hauling up to 7,215 lbs.[2] of payload and the phrase "**THE STRONGEST SILVERADO HD EVER**" takes on a much deeper meaning.

Want to configure your rig? Silverado HD gives you the choices you need to carry both cargo and crew. Choose from Regular Cab, Extended Cab or Crew Cab, all available in 2WD or 4x4 models to help you get the right people to the job.

The 2012 Silverado HD. This dependable, long-lasting workhorse of a truck comes with the best coverage of any full-size pickup—a **100,000-MILE/5-YEAR POWERTRAIN WARRANTY.**[3] Because we know it's one thing to talk quality and quite another to back it up.

101.    GM's 2013 Chevrolet Silverado HD brochure underlined the depth of their heritage and passion for what they do at Chevrolet. Chevrolet's brochure indicated that it is "ingrained in the bold design, spirited performance, proven durability, and exceptional value [their] drivers

enjoy."[62]    Moreover, GM touted its 2013 1500 HD trucks as the "most dependable[,] longest-lasting full-size pickups on the road[:]"[63]



102.    GM's 2014 Chevrolet Silverado HD brochure emphasized that consumers could "EXPECT THE BEST" and guaranteed that, "every Silverado 2500HD and 3500HD is backed by the Best Pickup Coverage in America, including a 100,000-mile/5-year Powertrain Limited Warranty and 24,000-mile/2-year scheduled maintenance. That's long-lasting dependability you can believe in:"[64]

---

[62]    2013    Chevrolet    Silverado    Vehicle    Brochure,    at    2,    available    at https://cdn.dealereprocess.net/cdn/brochures/chevrolet/2013-silverado1500.pdf    (last    accessed Nov. 16, 2018).

[63]    *Id.* at 4 (last accessed Nov. 16, 2018).

[64]    2014    Chevrolet    Silverado    HD    Vehicle    Brochure,    at    2,    available    at https://cdn.dealereprocess.net/cdn/brochures/chevrolet/2014-silverado2500hd.pdf    (last    accessed Nov. 16, 2018).



EXPECT THE BEST. The 2014 Silverado HD, with its available Duramax® Diesel engine and legendary Allison® transmission, is our most powerful HD truck ever. And to guarantee the quality, every Silverado 2500HD and 3500HD is backed by the Best Pickup Coverage in America, including a 100,000-mile/5-year Powertrain Limited Warranty¹ and 24,000-mile/2-year scheduled maintenance.² That's long-lasting dependability you can believe in.

SILVERADO HD /

103.    For the 2015 Chevrolet Silverado HD, which GM touted as "our most advanced heavy-duty pick-up ever," GM's vehicle brochure proclaimed, "You don't get to be part of the most dependable, longest-lasting full-size pickups on the road by tampering with what works. You build on proven success. You make your best even better[:]"[65]

## THE STRENGTH OF
## EXPERIENCE. SILVERADO HD.    /

Introducing the new Silverado HD. Built heavy-duty strong to help get you through the most demanding jobs, the 2015 Silverado HD offers the proven power of our Duramax 6.6L Turbo-Diesel V8 mated to the legendary Allison® transmission—produced by the makers of military tank transmissions. Or there's the muscle of our standard Vortec 6.0L V8. The new Silverado HD is heavy-duty smart, too. With its advanced exterior and interior designs, plus safety innovations including the available Safety Alert Driver Seat, the 2015 Silverado 2500HD and 3500HD move the strong tradition of Chevy trucks decisively forward.

Got something serious to tow? Got a mountain to climb? Silverado 3500HD can tow up to 23,200 lbs¹—without breaking a sweat. With advanced technology like Trailer Sway Control, Silverado HD is a tow vehicle that combines brute strength with engineering refinement.

You don't get to be part of the most dependable, longest-lasting full-size pickups on the road² by tampering with what works. You build on proven success. You make your best even better.

---

[65]    2015    Chevrolet    Silverado    HD    Vehicle    Brochure,    at    3,    available    at https://www.gmcertified.com/PDFs/ModelLibrary/Chevrolet/Silverado%20HD/2015-Chevrolet-Silverado-HD.pdf (last accessed Nov. 16, 2018).

104.    Additionally, in the Duramax diesel supplement to the owners' manual for the 2015 Duramax diesel Chevrolet Silverado and GMC Sierra, GM specifically represented that, "This vehicle is approved to use . . . diesel and biodiesel blends [which] must meet all the requirements as defined in the most current versions of the local fuel standards."[66]

105.    Likewise, GM touted the longevity and reliability of the Duramax 6.6L Turbo-Diesel engines in 2016 Chevrolet Silverado HD 2500 and 3500 vehicles by proclaiming that, "There are over 1 million Duramax diesels with Allison transmissions on the road today with over 100 billion miles of experience . . . . [The] Duramax Turbo-Diesel engine lets Silverado HD offer you best-in-class maximum conventional towing capability.  That's power you can trust to go the distance[:]"[67]

---

[66] 2015 Chevrolet/GMC Duramax Diesel Supplement, Sec. 9-21 ("Fuel"), available at https://my.chevrolet.com/content/dam/gmownercenter/gmna/dynamic/manuals/2015/gmc/sierra_1500/2015-Silverado%20HD%20&%20Sierra%20HD-Duramax-Diesel-Manual.pdf (last accessed Nov. 26, 2018).

[67] 2016 Chevrolet Silverado HD Vehicle Brochure, at 9, available at https://www.gmcertified.com/PDFs/ModelLibrary/Chevrolet/Silverado%20HD/2016-Chevrolet-Silverado-HD.pdf (last accessed Nov. 17, 2018).



Duramax 6.6L Turbo-Diesel V8 engine.

**DURAMAX 6.6L TURBO-DIESEL.** This is heavy-duty strength you can count on. There are over 1 million Duramax diesels with Allison® transmissions on the road today with over 100 billion miles of experience.

Churning out an earthshaking 765 lb.-ft. of torque, the available Duramax Turbo-Diesel engine lets Silverado HD offer you best-in-class maximum conventional towing capability.² That's power you can trust to go the distance.

**BUILT FOR THE EXTREME.** Duramax glow plugs heat up quickly and, together with Direct Injection, can help your Silverado HD start quickly in extremely cold temperatures.

At the other end of the spectrum, the engine oil cooler, transmission cooler and turbo intercooler will give you confidence when climbing even in the hottest conditions.

106. GM similarly touted the capability of the 2011 Chevrolet Express van by noting that its new 6.6L Duramax diesel engine had "up to 11-percent greater fuel economy" than previous models, along with a "new 30,000-psi (2,000 bar) piezo-actuated fuel injection system – capable of operating on ASTM grade B20 biodiesel[—]ensur[ing] more precise fuel delivery, improving emission performance."[68]

---

[68] "2011 Chevrolet Express Offers Powerful Duramax Diesel in 3500 Passenger Vans, Greater Connectivity," <u>GM Pressroom</u>, available at
 https://media.gm.com/media/us/en/chevrolet/vehicles/express-psgr/2011.html (last accessed Nov. 17, 2018).

107. Likewise, GM advertised the 2011 GMC Savana van as having a "new Duramax 6.6L turbo diesel" engine that was "more fuel-efficient—up to 11-percent greater fuel economy than the outgoing model," as well as having a "new 30,000-psi (2,000 bar) piezo-actuated fuel injection system—capable of operating on ASTM grade B20 biodiesel—ensur[ing] more precise fuel delivery, improving emission performance."[69]

108. GM also provided an express 60-month, 100,000-mile written warranty with the Class Vehicles it manufactured.

109. GM has repeatedly refused to honor its warranties, deviously claiming that the metal shavings caused by the failures of their pump design voided the warranty because they also caused fuel contamination.

110. Despite the clear mismatch between the Bosch CP4 Pump and American diesel fuel, GM has cleverly passed the $8,000.00–$20,000.00 cost of failure along to the consumer. GM's agents, specifically its dealerships, is oftentimes determining that CP4 pump failures are not under warranty. The logic is that when a European-designed CP4 pump mists internal diesel engine components, its innate incompatibility with less American diesel produces damaging levels of metal-on-metal friction, launching metal debris into the high-pressure fuel system and the engine. Warranties do not cover the use of contaminated fuel. Because the fuel is now contaminated with metal from the pump, the repairs are for fuel contamination and are not covered by the warranties.

111. GM induced Plaintiffs and other Class members to pay a premium for increased durability, performance and fuel efficiency, with a design GM has long known would cause fuel

---

[69] "2011 GMC Savana Offers Powerful Duramax Diesel in 3500 Passenger Vans, Greater Connectivity," GM Pressroom, available at
 https://media.gmc.com/media/us/en/gmc/vehicles/savana/2011.html (last accessed Nov. 17, 2018).

contamination—a condition GM now uses to absolve itself of the catastrophic and costly consequences to Plaintiffs and other Class members.

## V.       TOLLING OF THE STATUTE OF LIMITATIONS

110.    As of the date of this Complaint, GM continues to market the Class Vehicles based on superior durability, performance, and fuel efficiency, despite its knowledge that the Class Vehicles are defective and have failed or will fail—in fact, GM still has not disclosed and continues to conceal that the Class Vehicles are defective, incompatible with American diesel fuel, and will experience catastrophic and costly failure.

111.    Until shortly before the filing of this Complaint, Plaintiffs and other Class members had no way of knowing about GM's wrongful and deceptive conduct with respect to their defective Class Vehicles.

112.    With respect to Class Vehicles that have not experienced a catastrophic CP4 pump failure, Plaintiffs and other Class members did not discover and could not reasonably have discovered that their Class Vehicles are defective, that their Class Vehicles are out of specification and incompatible with American diesel fuel, that this incompatibility has resulted in the breakdown of fuel components and contamination of fuel caused by the defective CP4 fuel pump, that their CP4 fuel pumps will fail, that the durability and performance of their Class Vehicles is impaired by this defect and incompatibility and that such durability and performance is far less than GM promised, or that, as a result of the foregoing, they overpaid for their vehicles, the value of their vehicles is diminished, and/or their vehicles will require costly modification to avoid a catastrophic, even more costly failure, and that any such modifications will impair other qualities of the Class Vehicles that formed a material part of the bargain between the parties in the purchase of the Class Vehicles by Plaintiffs and other Class members.

113.    With respect to Class Vehicles that have experienced a catastrophic CP4 pump failure prior to the filing of this Complaint, Plaintiffs and other Class members did not discover and could not reasonably have discovered that their CP4 pump failure was due to a defect known to GM or that such failure was due to an incompatibility between the Class Vehicle and the fuel intended by GM to be used in the Class Vehicles.

114.    Within the period of any applicable statutes of limitation or repose, Plaintiffs and members of the proposed classes could not have discovered through the exercise of reasonable diligence that GM was concealing the conduct complained of herein and misrepresenting the defective nature of the Class Vehicles.

115.    Plaintiffs and other Class members did not discover, and did not know of, facts that would have caused a reasonable person to suspect that GM did not report information within their knowledge to consumers, dealerships, or relevant authorities; nor would a reasonable and diligent investigation have disclosed that GM was aware of the non-conforming and defective nature of the CP4 fuel pump and the Class Vehicles in which it was incorporated.  Plaintiffs only learned of the defective nature of the CP4 fuel injection pump and their vehicles, and of GM's scheme to design and sell such non-conforming and defective fuel pumps and vehicles, shortly before this action was filed.

116.    All applicable statutes of limitation and repose have also been tolled by GM's knowing, active, and fraudulent concealment, and denial of the facts alleged herein throughout the period relevant to this action.

117.    Instead of disclosing the defective nature of the CP4 fuel pumps to consumers, GM falsely represented that CP4 pump failure in the Class Vehicles was caused by Plaintiffs' or other Class members' conduct or by the use of contaminated fuel.

118.     In reality, GM's conduct in designing, manufacturing, marketing, or selling Class Vehicles for use with American diesel fuel, with which GM knew the Class Vehicles were incompatible, causes the "fuel contamination" that ultimately leads to CP4 pump failure.

119.     GM, with the purpose and intent of inducing Plaintiffs and other Class members to refrain from filing suit, pursuing warranty remedies, or taking other action with respect to GM's conduct or the Class Vehicles, fraudulently concealed the true cause of CP4 pump failure by blaming Plaintiffs, Class members, and/or contaminated fuel when GM, even before the design, manufacture, or sale of the Class Vehicles, knew that the defective nature of the Bosch CP4 Pump would and has caused fuel contamination and resulting CP4 pump failure.

120.     GM was under a continuous duty to disclose to Plaintiffs and other Class members the true character, quality, and nature of the durability and performance of Class Vehicles, the ongoing process of fuel contamination in Class Vehicles, CP4 pump failure, and the true cause of CP4 pump failure.  Instead, GM knowingly, affirmatively, and actively concealed or recklessly disregarded the foregoing facts.  As a result, GM is estopped from relying on any statutes of limitation or repose as a defense in this action.

121.     For the foregoing reasons, all applicable statutes of limitation and repose have been tolled by operation of the discovery rule and by GM's fraudulent concealment with respect to all claims against GM; and, GM is estopped from asserting any such defenses in this action.

## VI.     CLASS ACTION ALLEGATIONS

122.     Throughout this Complaint, "Class Vehicle" is defined as any GM-brand (i.e., GMC or Chevrolet) vehicle fitted at any time with a Bosch CP4 fuel pump.

123.     This is a class action brought pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Class:

All persons or entities in the state of Texas who are current or former owners and/or lessees of the following GM-brand vehicles equipped with a CP4 fuel injection pump system:

- 2011–2016 Chevrolet 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 Chevrolet 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 Chevrolet 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2011–2016 GMC 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LML engines;

- 2010–2011 Chevrolet Express van with Duramax LGH engines;

- 2010–2011 GMC Savana Van with Duramax LGH engines;

- 2010–2011 GMC Sierra Trucks with RPO ZW9 (chassis cabs or trucks with pickup box delete) with Duramax LGH engines;

- 2011–2012 Chevrolet 2500HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011–2012 Chevrolet 3500HD Silverado 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011–2012 Chevrolet 2500HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines;

- 2011–2012 Chevrolet 3500HD Sierra 6.6L V8 Duramax Diesel Trucks with LGH engines.

124. Excluded from the Class are individuals who have personal injury claims resulting from a CP4 fuel injection pump failure. Also excluded from the Class are GM and its officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any entity in which GM has a controlling interest. In addition, Governmental entities and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff are excluded from the Class. Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

125.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

126.    The Class Representatives are asserting claims that are typical of claims of the Class, and they will fairly and adequately represent and protect the interests of the Class in that they have no interests antagonistic to those of the putative Class members.

127.    The amount of damages suffered by each individual member of the Class, in light of the expense and burden of individual litigation, would make it difficult or impossible for individual Class members to redress the wrongs done to them.  Plaintiffs and other members of the Class have all suffered harm and damages as a result of GM's unlawful and wrongful conduct. Absent a class action, GM will likely not have to compensate victims for GM's wrongdoings and unlawful acts or omissions, and will continue to commit the same kinds of wrongful and unlawful acts or omissions in the future.

128.    **Numerosity under Federal Rule of Civil Procedure 23(a)(1):** The Class is so numerous that individual joinder of all of its members is impracticable.  Due to the nature of the trade and commerce involved, Plaintiffs believe that the total number of Class Plaintiffs is at least in the thousands, and are numerous and geographically dispersed across Texas.  While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery, as well as by the notice Class members will receive by virtue of this litigation so that they may self-identify.  The disposition of the claims of Class members in a single class action will provide substantial benefits to all Parties and the Court.  Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice. The number of persons for whom this action is filed

who are citizens of Texas effectively exhausts the membership of the class in this District, with the exception of some few, but unknown, transients in Texas or residents of Texas who happen to be citizens of other states.

129. **Commonality and Predominance under Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):** This action involves common questions of law and fact which predominate over any questions affecting individual Class members, including, without limitation:

    a.    Whether GM engaged in the conduct alleged herein;

    b.    Whether GM knew about the CP4 defect and the inherent problems related thereto when said component part is used with American diesel fuel, and if so, how long GM knew or should have known as much;

    c.    Whether GM designed, advertised, marketed, distributed, leased, sold, or otherwise placed the defective Class Vehicles into the stream of commerce in the United States;

    d.    Whether the GM diesel engine systems that are the subject of this complaint are defective such that they are not fit for ordinary consumer use;

    e.    Whether GM omitted material facts about the quality, durability, fuel economy, and vehicle longevity of the Class Vehicles;

    f.    Whether GM designed, manufactured, marketed, and distributed Class Vehicles with defective or otherwise inadequate fuel injection systems;

    g.    Whether GM's conduct violates Texas consumer protection statutes, and constitutes breach of contract or warranty and fraudulent concealment/misrepresentation, as asserted herein;

    h.    Whether Plaintiffs and the other Class members overpaid for their vehicles at the point of sale; and

i.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, what amount.

130.    **Typicality under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs' claims are typical of the other Class members' claims because all have been comparably injured through GM's wrongful conduct as described above.

131.    **Adequacy of Representation under Federal Rule of Civil Procedure 23(a)(3):** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent.  Additionally, Plaintiffs have retained counsel with substantial experience in handling complex class action and multi-district litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so.  The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

132.    **Superiority of Class Action under Federal Rule of Civil Procedure 23(b)(3):** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The financial detriment suffered by Plaintiffs and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM's wrongful conduct.  Even if members of the Class could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.    CAUSES OF ACTION

## COUNT I
## FRAUD BY OMISSION/MISREPRESENTATION

133.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as though fully set forth herein.

134.    Plaintiffs bring this Count individually and on behalf of the Class against GM.

135.    As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles.  Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

136.    As alleged above, GM intentionally concealed and suppressed material facts concerning the durability and performance of the Bosch CP4 Pump and (more importantly) facts concerning the durability and performance of the Class Vehicles and their engines, in order to defraud and mislead the Class about the true nature of the Class Vehicles.

137.    As alleged above, GM knew at least by 2002 that its diesel fuel injection systems required heightened lubricity, which was not met by American diesel fuel specifications.

138.    As alleged above, GM had specific knowledge by at least 2002 that their fuel injection systems were incompatible with American diesel fuel specifications.

139.    As alleged above, prior to the design, manufacture, and sale of the Class Vehicles, GM knew that the Bosch CP4 Pumps were expected to quickly fail in the Class Vehicles and that such failure would result in contamination of the fuel system components and require repair and replacement of those components, the repairs or replacements of which GM would refuse to cover under their warranties.

140.    Despite this knowledge, GM marketed the Class Vehicles, touting the increased durability and performance of the Class Vehicles.

141.     The foregoing omitted facts and representations were material because they directly impacted the value of the Class Vehicles purchased or leased by Plaintiffs and other Class members, because those facts directly impacted the decision regarding whether or not Plaintiffs and other Class members would purchase a Class Vehicle, and because they induced and were intended to induce Plaintiffs and other Class members to purchase a Class Vehicle.

142.     Due to their specific and superior knowledge that the Bosch CP4 Pumps in the Class Vehicles will fail, and due to their false representations regarding the increased durability of the Class vehicles, GM had a duty to disclose to Class members that their vehicles were incompatible with the use of U.S. fuel, that the Bosch CP4 Pumps will fail in Class Vehicles, that Class Vehicles do not have the expected durability over other diesel vehicles or of their namesake predecessor engines, that failure of the Bosch CP4 Pumps will cause damage to Class Vehicle engines and engine systems, and that Class members would be required to bear the cost of the damage to their vehicles.

143.     GM knew that Plaintiffs and other Class members reasonably relied upon GM's false representations and omissions.  Plaintiffs and other Class members had no way of knowing that GM's representations and omissions were false and misleading, that the Class Vehicles were incompatible with the fuel GM knew would be used to operate the Class Vehicles, that the normal and intended use of the Class Vehicles will cause the Bosch CP4 Pumps to fail, or that GM would refuse to repair, replace, or compensate Plaintiffs and other Class members for the failure of the Bosch CP4 Pumps and the known consequences of that failure to the Class Vehicle engines.

144.     Plaintiffs and other Class members could not have known that the Class Vehicles, which were touted by GM for their durability and performance, will fail when used as intended by GM.

145.    GM knew that Plaintiffs and other Class members could not have known that Class Vehicles will fail when used as intended by GM.

146.    GM falsely represented the durability of the Class Vehicles and omitted material facts regarding the lack of durability of the Class Vehicles, the incompatibility of the Class Vehicles with the fuel intended by GM to be used in the Class Vehicles, and the consequences of that incompatibility, for the purpose of inducing Plaintiffs and other Class members to purchase Class Vehicles, and to increase their revenue and profits.

147.    GM's devious scheme to design, market, and sell Class Vehicles with defective CP4 pumps, knowing that U.S. fuel was certain to be used in the Class Vehicles and the consequence of using U.S. diesel fuel in those vehicles, then concealing their fraudulent scheme from the public and consumers over numerous model years, reveals a corporate culture that emphasized sales and profits over integrity and an intent to deceive Plaintiffs, other Class members and the American public regarding the durability and performance of the Class Vehicles and their fuel delivery systems.

148.    GM had a duty to disclose the incompatibility of Class Vehicles with U.S. diesel fuel, including the consequences of that incompatibility, to Plaintiffs and Class members.

149.    Had Plaintiffs and other Class members known that the Class Vehicles did not have increased durability over other diesel vehicles, that the Class Vehicles were incompatible with the fuel intended by Plaintiffs, the other Class members, and GM to be used in the Class Vehicles (without which the Class Vehicles would serve no purpose to Plaintiffs and other Class members), or that the Class Vehicles will fail when used as intended, Plaintiffs and other Class members would not have purchased a Class Vehicle, or would have paid substantially less for their Class Vehicle based on GM's false representations and omissions, or, in the case of Plaintiffs and other

Class members whose vehicles experienced CP4 pump failure, would have taken affirmative steps to mediate the impact of or prevent failure.

150.     Because of GM's false representations and omissions, Plaintiffs and other Class members have sustained damages because they own vehicles that are diminished in value as a result of GM's concealment of the true nature and quality of the Bosch CP4 Pump and the Class Vehicles.

151.     GM's failure to disclose the incompatibility of the Class Vehicles with U.S. diesel fuel was intended to cause and did cause Plaintiffs and other Class members to operate Class Vehicles with U.S. fuel; and, as a result, certain Plaintiffs and other Class members have been damaged by the failure of the Bosch CP4 Pumps and the resulting failure of Class Vehicle engines, resulting in damages to Class members and Plaintiffs including but not limited to the cost of repair or replacement of the CP4 fuel pump, the cost of damage caused to the Class Vehicles by the failure of the CP4 fuel pump, loss of use of the Class Vehicles, loss of earnings, and other damages.

152.     Accordingly, GM is liable to Plaintiffs and other Class members for damages in an amount to be proved at trial.

153.     GM's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and other Class members' rights, and the representations made by GM to them were made in order to enrich GM.  GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### COUNT II
### VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT ("DTPA"),
### (Tex. Bus. & Com. Code §§ 17.41, *et. seq.*)

154.     Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as though fully set forth herein.

155.     Plaintiffs intend to assert this Count individually and on behalf of the Class against GM.

156.     Plaintiffs intend to assert a claim under the Texas Deceptive Trade Practices-Consumer Protection Act ("DTPA"), which makes it unlawful to commit "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Com. Code § 17.46. Plaintiffs will make a demand in satisfaction of the Act and may amend this Complaint to Assert claims under the Act once the required sixty (60) days have elapsed. This paragraph is included for purposes of notice only and is not intended to actually assert a claim under the Texas Deceptive Trade Practices Act.

## COUNT III
## UNJUST ENRICHMENT

157.     Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as though fully set forth herein.

158.     Plaintiffs bring this Count individually and on behalf of the Class against GM.

159.     As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

160.     As a result of its wrongful and fraudulent acts and omissions, as set forth herein, pertaining to the defects in the Bosch CP4 pump and the Class Vehicles and the concealment thereof, GM charged a higher price for the Class Vehicles than the Vehicles' true value and GM, therefore, obtained monies that rightfully belong to Plaintiffs and other Class members.

161.　　GM has benefitted from manufacturing, selling, and leasing at an unjust profit defective Class Vehicles whose value was artificially inflated by GM's concealment of the defective nature of the CP4 fuel pump and of the Class Vehicles, and false representations related thereto.

162.　　GM enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other Class members, who paid a higher price for their vehicles that actually had lower values.

163.　　GM has received and retained unjust benefits from the Plaintiffs and other Class members, and inequity has resulted.

164.　　It would be inequitable and unconscionable for GM to retain these wrongfully obtained benefits.

165.　　Because GM concealed its fraud and deception, Plaintiffs and other Class members were not aware of the true facts concerning the Class Vehicles and did not benefit from GM's misconduct.

166.　　GM knowingly accepted and retained the unjust benefits of its fraudulent conduct.

167.　　As a result of GM's misconduct, the amount of its unjust enrichment should be disgorged and returned to Plaintiffs and other Class members, in an amount to be proven at trial.

168.　　Plaintiffs and other Class members, therefore, seek an order establishing GM as a constructive trustee of the profits unjustly obtained, plus interest.


**COUNT IV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY,**
**(Tex. Bus. & Com. Code §§ 2.314 and 2A.212)**

169.　　Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as though fully set forth herein.

170.　　Plaintiffs bring this Count individually and on behalf of the Class against GM.

171.     As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery systems upon the first use of the Class Vehicles.  Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

172.     GM was at all times a "merchant" with respect to motor vehicles under Tex. Bus. & Com. Code § 2.104(1) and 2A.103(a)(2), and a "seller" of motor vehicles under § 2.103(a)(4).

173.     With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Tex. Bus. & Com. Code § 2A.103(a)(16).

174.     The Class Vehicles are and were at all relevant times "goods" within the meaning of Tex. Bus. & Com. Code. §§ 2.105(a) and 2A.103(a)(16).

175.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which the vehicles are used is implied by law, pursuant to Tex. Bus. & Com. Code § § 2.314 and 2A.212.

176.     The Class Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the Class Vehicles are incompatible with the use of American diesel fuel (the fuel intended to be used by GM and expected to be used by Plaintiffs and other Class members) in that use of American diesel fuel (the only fuel reasonably available to Plaintiffs and other Class members) causes a breakdown of the CP4 fuel pump (a condition that GM knew would occur prior to the design and sale of the Class Vehicles), resulting in fuel contamination, ultimate and catastrophic failure of the Bosch CP4 pump, and contamination and failure of other components in the Class Vehicle fuel delivery system.

177.     It was reasonable to expect that Plaintiffs may use, consume or be affected by the defective vehicles.

178.    The Class Vehicles contained an inherent defect that was substantially certain to result in malfunction during the useful life of the product.

179.    Plaintiffs were and are third-party beneficiaries to the defendant manufacturer's contracts with GM-certified/authorized retailers who sold the Class Vehicles to Plaintiffs.

180.    In addition, or in the alternative, Plaintiffs directly relied upon Defendant GM's advertising, as alleged above.

181.    GM was provided notice of these issues within a reasonable time of Plaintiffs' knowledge of the non-conforming or defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to GM, complaints by Plaintiffs or Class members to GM either orally or in writing, complaints to GM dealerships, intermediate sellers, or repair facilities either orally or in writing, presentation of the vehicles for repair to dealerships or to intermediate sellers or repair facilities, countless consumer complaints to NHTSA regarding the defect that is the subject of this Complaint, and/or by the allegations contained in this Complaint.

182.    As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and other Class members have been damaged in an amount to be proven at trial.

### COUNT V
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT,
### (15 U.S.C. § 2301, *et seq.*)

183.    Plaintiffs re-allege and incorporate Paragraphs 1 through 132 as though fully set forth herein.

184.    Plaintiffs bring this Count individually and on behalf of the Class against GM.

185.    As set forth above, Plaintiffs and other Class members have suffered from a defect that existed in the Class Vehicles which began damaging the Class Vehicles and their fuel delivery

systems upon the first use of the Class Vehicles. Plaintiffs and other Class members are seeking recovery for this manifested defect and any and all consequential damages stemming therefrom.

186. This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)–(d).

187. The Class Vehicles manufactured and sold by GM are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

188. Plaintiffs and other Class members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantors the obligations of their implied warranties.

189. GM was a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)–(5).

190. GM provided Plaintiffs and other Class members with an implied warranty of merchantability in connection with the purchase or lease of the Class Vehicles, that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, GM warranted that the Class Vehicles were fit for their ordinary purpose as motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

191. GM breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs and other Class members pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles were equipped with defective CP4 fuel pumps that are incompatible with American diesel fuel (which fuel is intended by GM to be used in the Class Vehicles, expected by Plaintiffs and other Class members to be used in Class Vehicles, and is the only fuel reasonably available in order for Plaintiffs and other Class members to use the Class Vehicles for their

intended or ordinary purpose), which, when used with the intended American diesel fuel, break down, resulting in fuel contamination, complete and catastrophic failure of the Bosch CP4 Pump, and contamination and catastrophic and costly failure of the Class Vehicles' fuel delivery systems.

192.    In its capacity as a warrantor, GM had knowledge of the inherent defects in the Class Vehicles. Any effort by GM to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

193.    Any limitations GM might seek to impose on their warranties are procedurally unconscionable. There was unequal bargaining power between GM and Plaintiffs and the other Class members, as, at the time of purchase and lease, Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from GM.

194.    Any limitations GM might seek to impose on its warranties are substantively unconscionable. GM knew that the Class Vehicles were defective and would continue to fail during and after any purported expiration of warranties.

195.    Despite knowing that failure was expected to occur with the intended use of American diesel fuel, GM failed to disclose these defects to Plaintiffs and the other Class members. Therefore, any enforcement of the durational limitations on those warranties is harsh and shocks the conscience, and moreover violates public policy.

196.    Plaintiffs and each of the other Class members have had sufficient direct dealings with either GM or its agents (*i.e.*, dealerships) to establish privity of contract between GM, on the one hand, and Plaintiffs and each of the Class members, on the other hand. Nevertheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and

have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.

197.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

198.    Nonetheless, GM was provided notice of the defective and non-conforming nature of the Class Vehicles, as described herein, within a reasonable time of Plaintiffs' knowledge of the non-conforming and defective nature of the Class Vehicles, by letters from Plaintiffs' counsel, on behalf of Plaintiffs, to GM, complaints by Plaintiffs or Class members to GM either orally or in writing, complaints to dealerships, intermediate sellers, or repair facilities either orally or in writing, complaints to NHTSA, presentation of the vehicles for repair to dealerships, intermediate sellers or repair facilities, and by the allegations contained in this Complaint.

199.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.00.  The amount in controversy of this action exceeds the sum of $50,000.00 exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of members of the Class, respectfully request that the Court enter judgment in their favor and against GM as follows:

A.      Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel;

B.      An order temporarily and permanently enjoining GM from continuing unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.      Injunctive relief in the form of a recall, free replacement, or buy-back program;

D.      An order establishing GM as a constructive trustee over profits wrongfully obtained, plus interest;

E.      Costs, restitution, damages, including punitive damages, exemplary damages and treble damages, and disgorgement in an amount to be determined at trial;

F.      An order requiring GM to pay both pre- and post-judgment interest on any amounts awarded;

G.      An award of costs and attorney's fees; and

H.      Such other or further relief as may be appropriate.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims so triable.

Dated: December 20, 2018              Respectfully submitted,

/s/ Robert C. Hilliard
Robert C. Hilliard
Texas State Bar No. 09677700
Federal I.D. No. 5912
Hilliard, Martinez, Gonzales LLP
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401

Phone: (361) 882-1612
Fax: (361) 882-3015
Email: bobh@hmglawfirm.com
***ATTORNEY IN CHARGE FOR
PLAINTIFFS***

**OF COUNSEL:**
Rudy Gonzales, Jr.
Texas State Bar No. 08121700
Federal I.D. No. 1896
Email: rudy@hmglawfirm.com
John B. Martinez
Texas State Bar No. 24010212
Federal I.D. No. 25316
Email: john@hmglawfirm.com
Marion Reilly
Texas State Bar No. 24079195
Federal I.D. No. 1357491
Email: marion@hmglawfirm.com
Bradford P. Klager
State Bar No. 24012969
Federal I.D. No. 24435
Email: brad@hmglawfirm.com

**HILLIARD MARTINEZ GONZALES LLP**
719 S. Shoreline Blvd.
Corpus Christi, Texas 78401
Phone: (361) 882-1612
Fax: (361) 882-3015

*-And-*

T. Michael Morgan, Esq.
FBN: 0062229
E-Mail: mmorgan@forthepeople.com
Secondary Email: plarue@forthepeople.com
**MORGAN & MORGAN, P.A.**
20 North Orange Ave., Ste. 1600
P.O. Box 4979
Orlando, FL 32801
Tel.: (407) 418-2081
Fax: (407) 245-3392

*-And-*

Steve W. Berman
steve@hbsslaw.com
Sean R. Matt

sean@hbsslaw.com
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594